Milton J. Shapp, Governor of the Commonwealth of Pennsylvania and Norval Reece, Special Assistant to the Governor for Inter-Governmental Relations, Commonwealth of Pennsylvania *v.* Robert J. Butera, Minority Leader of the House of Representatives, Commonwealth of Pennsylvania, Appellant.

230

Argued September 10, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER and ROGERS. Judge BLATT did not participate.

*Edward C. Hussie*, with him *Matthew F. Coppolino* and *John J. Burfete*, for appellant.

*Burton D. Morris*, Deputy Attorney General, with him *Lawrence J. Beaser*, Special Assistant Attorney General, and *Robert P. Kane*, Attorney General, for appellees.

OPINION BY JUDGE KRAMER, December 8, 1975:

This is an appeal filed by Robert J. Butera, the Minority Leader of the House of Representatives, from a denial by Milton J. Shapp, Governor of the Commonwealth of Pennsylvania, and Norval Reece, Special Assistant to the Governor for Inter-Governmental Relations, of the right to examine, inspect and copy financial disclosure statements filed in the Governor's office by members of the Governor's Cabinet and members of "certain" agencies, boards, and commissions. The statements were filed pursuant to an "Executive Order" of April 29, 1971. The appeal was filed under the provisions of the Act of June 21, 1957, P.L. 390, *as amended*, 65 P.S. §66.1 et seq., commonly known as the Right To Know Act. Although the Act does not specifically set forth procedural requirements, Section 4, 65 P.S. §66.4 (as partially amended by

the Appellate Court Jurisdiction Act of 1970)[1] provides for judicial review of "agency" decisions.

The case is in the nature of a statutory appeal and the record before us consists only of a pleading in the form of an acknowledged petition setting forth allegations, exhibits and exceptions to the alleged denial by the Governor and Reece. Butera asks this Court to reverse the denial and to order the Governor to permit him to examine, inspect, and copy the requested financial disclosure statements. Because we conclude that the documents requested do not come within the purview of the Right To Know Act, we will dismiss the appeal.

On April 29, 1971, the Governor issued an "Executive Order" on the subject of "disclosure of financial interests." This Executive Order was published as an official document in the Pennsylvania Bulletin, 1 Pa. B. 1265, and subsequently codified in the Pennsylvania Code, 4 Pa. Code §7.71 et seq. The first paragraph of the Executive Order, as it was issued by the Governor's office on April 29, 1971,[2] reads as follows:

> "You are probably all aware that I shall shortly make full disclosure of all my financial interests and holdings. In keeping with this policy, I am *requesting* similar disclosure by all members of my Cabinet and members of certain boards, commissions and agencies, as of the date you assumed your present position. If there has been no significant change, the disclosure can be as of the date of the disclosure." (Emphasis added.)

The financial disclosure was to include (a) the listing of all organizations with which the reporting person serves as an employe, officer, director, trustee, consultant, or in any other capacity; (b) the listing of ownership

---

1. Section 508(a)(90) of the Act of July 31, 1970, P.L. 673, 17 P.S. §211.508(a)(90).

2. This language was not included in the Code.

interests in all personalty and realty held and any other income resulting from prior employment, pension or retirement plans, together with any other assets not specifically mentioned; and (c) all liabilities of the reporting person. The statements were intended to include identical information for the reporting person's spouse, minor children or other members of the immediate household. The statements were to be filed semiannually, and the Executive Order contains a concluding paragraph expressing hope that "this request will not prove too burdensome" and noting that "[t]he statements will be made available to the press." There are no words in the Executive Order mandating, or requiring, under threat of some penalty, the filing of the financial statements, and, with the possible exception of the term "Cabinet Members," there is no clear description of the persons included in the phrase "Key Personnel and Chairmen and Members of Certain Boards, Commissions and Agencies" (to whom the Executive Order is directed).

During February, 1975, Butera, by letter and through employes of the House of Representatives, requested the Governor to permit him to examine, inspect and copy all of the financial disclosure statements which had been filed by present and past Cabinet Members and "Members of Certain Boards, Commissions and Agencies." These requests were denied by Reece on behalf of the Governor. Reece's responses urged Butera to assist the —Governor in obtaining financial statements from certain members of boards, commissions and agencies who had failed to file financial disclosures. In one of his letters an offer was made by Reece to grant Butera's request on the condition that Butera would file a financial disclosure statement. At about this time, the Governor issued a memorandum (dated February 26, 1975) which was not entitled an "Executive Order," but which was directed to "Cabinet Members, Members of Certain Boards, Commissions and Agencies and Key Personnel,"

setting forth a "uniform financial interest disclosure form." Once again there was no description of exactly who was expected to file these forms. On March 3, 1975, Butera filed an appeal to this Court.

Setting aside the obvious political vitriol found in the correspondence between the parties, the serious legal question presented to us is whether the financial disclosure statements filed in the Governor's office pursuant to the Executive Order of April 29, 1971, are public records under the Right To Know Act, thereby giving Butera a legal right to see them. Preparatory to that determination, we must examine the nature of an "Executive Order."

Under the Constitution of the Commonwealth of Pennsylvania "[a]ll power is inherent in the people," Pa. Const. of 1968, art. I, §2, and no person nor branch of government has any more power than is provided by that absolute framework of government. Article IV, Section 1 of the Constitution states:

> "The *Executive Department* of this Commonwealth shall consist of a Governor, Lieutenant Governor, Attorney General, Auditor General, State Treasurer and Superintendent of Public Instruction and such other officers as the General Assembly may from time to time prescribe." (Emphasis added.)

Article IV, Section 2, states, in pertinent part, that "[t]he supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed . . ."; and Article IV, Section 10, states that "[t]he Governor may require information in writing from the officers of the Executive Department, upon any subject relating to the duties of their respective offices." There is no mention in the Constitution of "Executive Orders."

We have been referred to only two statutory provisions which mention an executive order. The first is found in Section 916 of The Administrative Code of

1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. §306, which states:

"The Governor, by Executive Order, shall designate which of the powers and duties . . . shall be exercised by the Commissioner of Correction and which shall be exercised by the boards of trustees."

This provision was intended to resolve any conflicts between the Commissioner and boards of trustees of state correctional institutions. The second reference is found in Section 302 of the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §1302, which provides that certain documents shall be codified in the Pennsylvania Code. The list of documents to be codified includes "[a]ll proclamations and executive orders of the Governor which are general and permanent in nature."

The intriguing question concerning the legal status of a Governor's executive order is a question of first impression. We start with the proposition that the Governor has that power which has been delegated to him by the Constitution and statutory provisions, or which may be implied properly from the nature of the duties imposed upon the Governor. Our research discloses[3] that there are three types of executive orders.

The first type includes formal, ceremonial and political orders, which are usually issued as proclamations. The usual purpose of a proclamation is to declare some special day or week in honor of or in commemoration of some special thing or event. It is issued to make the public aware of the commemoration and usually has no legal effect. For example, if, upon the passing of a President of the United States, the Governor, by executive order, would direct that all flags be flown at half-mast for a period of time, his order could not be enforced

---

3. *See* Note, "Gubernatorial Executive Orders As Devices For Administrative Direction and Control". 50 *Iowa L. Rev.* 78 (1964).

unless there was some constitutional or statutory provision authorizing such an order. If, however, the Governor ordered the closing of all governmental offices during the day of the funeral of a deceased President, obviously this could affect legal rights, such as the filing of an appeal within the time required by statute.

The second class of executive orders is intended for communication with subordinate officials in the nature of requests or suggested directions for the execution of the duties of the Executive Branch of government. Like the first classification, this class is not legally enforceable, and the Governor could not seek a court order to enforce his executive order. The executive order would carry only the implication of a penalty for noncompliance, such as a possible removal from office, an official demotion, restrictions on responsibilities, a reprimand, or a loss of favor.

The third classification includes those executive orders which serve to implement or supplement the Constitution or statutes. These executive orders have the force of law. If, for instance, the Governor issued an executive order under Article IV, Section 10, quoted above, requiring information from officers of the Executive Department upon a subject relating to the duties of their respective offices and any such officers refused, the Governor could obtain a court order and the sanctions of noncompliance with a court order to enforce the executive order. The distinction between this third classification and the second classification is based upon the presence of some constitutional or statutory provision, which authorizes the executive order either specifically or by way of necessary implication.

In no event, however, may any executive order be contrary to any constitutional or statutory provision, nor may it reverse, countermand, interfere with, or be contrary to any final decision or order of any court. The Governor's power is to execute the laws and not to create

or interpret them. The Legislative Branch of government creates laws, and the Judicial Branch interprets them. The practical sense of our system of separation of powers can be demonstrated by reference to executive orders of the Governors of two States on the same subject. In 1963 the Governor of California, by an executive order[4] dated July 24, 1963, instituted a Code of Fair Practices against racial discrimination in governmental operations. The order was based upon what the Governor declared to be "the clear mandate of [the] federal and state constitutions." During that same year, the Governor of Alabama, by executive order[5] dated September 9, 1963, directed the maintenance of segregated public schools. He based his order upon the threatened deprivation of the equal protection of the laws and the rights and liberty of Alabama's citizens without due process of law. Both Governors seized upon their interpretation of the Constitution and of their power which is essentially the same as that found in the Pennsylvania Constitution, *i.e.*, the Governor is the supreme executive power to take care that the law be faithfully executed. It is clear to us that the Executive Branch, through executive orders, is not permitted under our system of government to usurp the judicial prerogative to interpret constitutional or statutory provisions. If such power was granted, those interpretations would be subject to change at least every four years, and the law would be filled with uncertainty. Furthermore, the only legal enforcement procedure available to the Executive Branch of government is through the Judicial Branch.

The executive order in question is of the second classification mentioned above and represents merely a communication to certain unnamed (and inadequately-described) officials, requesting the submission of finan-

---

4. Cal. Exec. Order, July 24, 1963.

5. Ala. Exec. Order Nos. 10, 11, 12, Sept. 9, 1963.

cial statements. Quite candidly, Counsel for the Governor admitted that this executive order was not legally enforceable, that, in fact, some persons who were requested to file the statements refused to do so, and that the only forces brought to bear in an attempt to seek compliance were persuasion and public embarrassment. If the Governor had attempted to issue the executive order pursuant to Article IV, Section 10 of the Constitution, or perhaps under the provisions of Section 701 of the Administrative Code, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §§241(d) and (e), a different question might have been presented. We must add, however, that, to be legally effective, any such executive order would have to be much more specific in disclosing who was included within its meaning.

We find no constitutional or statutory description of "Cabinet Members." The Governor's "Cabinet" consists of those persons he chooses. This Court also has no way of knowing what persons comprise "Key Personnel and Chairmen and Members of Certain Boards, Commissions and Agencies." The vagueness of the terms used by the Governor in this Executive Order militates against a conclusion that the executive order was even intended to be legally binding and enforcible.

The financial statements requested by the Governor had no more legal effect than a request by the Governor to have birthday greetings sent to him. Since there was no legal requirement for the filing of the financial statements, they must be deemed to have been voluntarily submitted, solely for the Governor's purposes.

In this context we examine the issues raised under the Right To Know Act, 65 P.S. §66.1(1). The statutory definition of "agency" is as follows:

"Any department, board or commission of the *executive branch* of the Commonwealth, any political subdivision of the Commonwealth, the Pennsylvania Turnpike Commission or any State or municipal au-

thority or similar organization created by or pursuant to a statute which declares in substance that such organization performs or has for its purpose the performance of an essential governmental function." (Emphasis added.)

Butera points to Article IV, Section 1 of the Constitution, quoted above, and then refers to Section 201 of the Administrative Code, 71 P.S. §61, which provides, in similar language, that "[t]he executive and administrative work of this Commonwealth shall be performed by the *Executive Department,* consisting of the Governor. . . ." (Emphasis added.) The unfortunate choice of words in the Right To Know Act causes some confusion regarding whether the Governor himself should be included within the meaning of the term "executive branch." We have no great difficulty with this uncertainty, however, after considering the general purpose of the Right To Know Act, and the fact that the Governor is the *head* of the Executive Branch. As the head of the Departments collectively, he is, in a real sense, a part of each of them. It would be incongruous to conclude that each Department must comply with the Right To Know Act but that the ultimate repository of *all* executive authority does not have to comply. We can see no basis in the statute for attributing such an intention to the Legislature. The statute is clearly intended to be as inclusive as possible.

We are left with the issue of whether these financial disclosure statements come within the definition of "public record" found in Section 1(2) of the Right To Know Act, 65 P.S. §66.1(2). That definition reads, in pertinent part:

"Any account, voucher or contract dealing with the receipt or disbursement of funds by an agency or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and

*any minute,* order or *decision* by any agency *fixing* the personal or property rights, privileges, immunities, *duties or obligations* of any person or group of persons. . . ." (Emphasis added.)

Butera argues that the disclosure statements are "minutes" or "decisions" which fix the "duties" of those required to file the statements. Apparently aware that the statute would appear to cover only the executive order, which "fixes" any obligation for compliance, Butera urges us to view the *response* to the order (*i.e.,* the disclosure statements) as a part of a "transaction" in which duties or obligations were fixed. In light of our holding that the Executive Order was not enforceable by law, we must dismiss Butera's contention. Even assuming (without deciding) that his transactional analysis is correct, the Executive Order cannot have fixed a legal "duty" or "obligation" within the meaning of the statute if compliance was voluntary.

In summary, the executive order issued by the Governor on April 29, 1971, and his memorandum dated February 26, 1975, are merely that class of executive order intended to be communication between the Governor and certain individuals. The statements are, therefore, in the nature of personal communications to the Governor. The financial statements and their custody, review, evaluation, and dissemination are within the unfettered discretion of the Governor, and the Right To Know Act gives Butera no legal right to examine or copy them. We therefore issue the following

ORDER

AND NOW, this 8th day of December, 1975, based upon the above discussion, the Appeal of Robert J. Butera is dismissed.