**Senator Peter KINDER,
et al., Appellants,**

v.

**Robert HOLDEN, Governor of
the State of Missouri,
Respondent.**

**No. WD 61067.**

Missouri Court of Appeals,
Western District.

Dec. 17, 2002.

Richard Paul, III, George Leonard, Kansas City, MO, Daniel Bloom, Charles Kramer, St. Louis, MO, David M. Kight, Kansas City, MO, for Appellant.

Alana M. Barragan–Scott, Jefferson City, MO, for Respondent.

Before LOWENSTEIN, P.J., SMART and NEWTON, JJ.

## Overview

HAROLD L. LOWENSTEIN, Judge.

A group of plaintiffs consisting of Missouri state legislators, organizations, and individual state employees sought a judicial declaration that an executive order issued by Governor Holden violated laws of Missouri and the United States.

At the core of this declaratory judgment action is whether a Missouri Governor's executive order dealing with binding arbitration in labor negotiations between state employees and executive agencies and departments, as to wages, hours, and working conditions, usurps what is a strictly legislative function and may, therefore, be declared invalid. While emotions and opinions in this area of public sector labor law readily appear, Missouri case precedent evaluating the extent of a Governor's power to issue executive orders is scarce and almost non-existent with regard to the

issue of labor negotiation between the executive department and its employees.

To better understand the issue at bar, a brief summary of Missouri public sector labor law is in order. In 1965, the Missouri General Assembly enacted the Public Sector Labor Law, § 105.500 RSMo[1] *et seq.*, which provides that public employees, excluding certain professions, have "the right to form and join labor organizations and to present proposals to any public body relative to salaries and other conditions of employment through the representative of their own choosing." § 105.510. Whenever a proposal is presented by a bargaining representative to a public body, the public body or its representative is required to "meet, confer, and discuss such proposals relative to salaries and other conditions of employment." § 105.520. Upon the completion of such discussions, the results must be reduced to writing and presented to the appropriate body for adoption, modification, or rejection. § 105.520. This statutory scheme has been described as a "meet, confer, and discuss law," and has been upheld by our Supreme Court. *See Sumpter v. Moberly,* 645 S.W.2d 359 (Mo. banc 1982); *Curators, Univ. of Mo. v. Pub. Serv. Employees Local No. 45, Columbia,* 520 S.W.2d 54 (Mo. banc 1975); *State ex rel. Missey v. City of Cabool,* 441 S.W.2d 35 (Mo.1969).

The seminal case in this area is *City of Springfield v. Clouse,* 356 Mo. 1239, 206 S.W.2d 539 (1947). The Court in *Clouse* acknowledged that, while the United States and Missouri Constitution gave public employees the right to organize and to speak freely to public officers or the legislature, those constitutional rights did not extend to collective bargaining as to qualifications, tenure, compensation, and working conditions, because those matters

1. All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise

indicated.

were strictly legislative and could not be delegated or contracted away by administrative or executive officers. *Id.* at 542–46. The Court in *Clouse* stated, in sweeping language:

> [T]he whole matter of qualifications, tenure, compensation and working conditions for any public service, involves the exercise of legislative powers. Except to the extent that all the people have themselves settled any of these matters by writing them into the Constitution, they must be determined by their chosen representatives who constitute the legislative body. It is a familiar principal of constitutional law that the legislature cannot delegate its legislative powers and any attempted delegation thereof is void. If such powers cannot be delegated, they surely cannot be bargained or contracted away; and certainly not by any administrative or executive officers who cannot have any legislative powers. Although executive and administrative officers may be vested with a certain amount of discretion and may be authorized to act or make regulations in accordance with certain fixed standards, nevertheless the matter of making such standards involves the exercise of legislative powers. Thus qualifications, tenure, compensation and working conditions of public officers and employees are wholly matters of lawmaking and cannot be the subject of bargaining or contract. Such bargaining could only be usurpation of legislative powers by executive officers; and, of course, no legislature could bind itself or its successor to make or continue any legislative act. (citations omitted).

*Id.* at 545.

## I. Procedural and Factual History

### A. The Executive Order

On June 29, 2001, the defendant, Governor Robert Holden, issued Executive Order 01–09 ("Order"). Paraphrased, and set out in pertinent part below, the Order established a mechanism for negotiation between state agencies and the employees of those agencies.

Paragraph one of the Order requires executive branch departments and agencies, which are directly under the control of the Governor, to meet and confer in good faith with the certified bargaining representatives of the public employees to resolve disputes and to reach a written memorandum of understanding as to agreed upon items.

Paragraph two states that if unresolved issues remain after sixty days, then "impasse negotiation" procedures are instituted which include: (1) assistance by an impartial person or representative from the Federal Mediation and Conciliation Service who will render "non-binding advice"; and, if that is not successful, then (2) submission of those unresolved issues to an arbitrator to conduct hearings and render "a final and determinative recommendation." Paragraph three lists factors the arbitrator should consider in making a recommendation.

Paragraph four states that all memoranda of agreement must contain a grievance procedure and must provide for binding arbitration of issues arising under the agreement "that may be legally binding under the Missouri Constitution and laws...." This paragraph also contains language that no arbitration award under this section shall require any additional appropriation of funds.

Paragraph five provides that, where the state and the employees have reached a negotiated agreement, "any provision of the agreement which requires an additional appropriation of funds or which is found

to be in conflict with the Missouri Constitution or laws shall take effect only on required approval of the appropriation of such funds or required legislative or Constitutional enactment." Paragraph five also states that if a recommendation of an arbitrator made pursuant to the second paragraph: (1) requires legislative approval; (2) requires an appropriation; (3) is "contrary to law"; or (4) requires action by the executive or legislative branch, then the recommendation "shall be of no force and effect until such action is taken."

Paragraph six provides that state agencies "may" include in memoranda provisions requiring employees to remit dues and service fees to the certified bargaining representative.

Finally, paragraphs seven through nine state that failure of the General Assembly to approve any portion of a memorandum agreed to by the state agency will not constitute bad faith negotiation. The Order also has a severability clause so that if any portion of the Order is invalidated by the courts or the General Assembly, the rest of the order is to remain in force. (Executive Order 01–09 is set forth in its entirety as an appendix).

## B. Plaintiffs and their Petition

On September 24, 2001, plaintiffs filed a four-count petition seeking a declaratory judgment that the Order violated various Missouri statutes and provisions of the Missouri and United States Constitutions.

Plaintiffs consist of: (1) two Missouri state legislators; (2) several organizations; and (3) individual executive department employees. The two Missouri state legislators are: Peter Kinder, President Pro-Tem of the Missouri Senate; and Charles Quincy Troupe, a member of the Missouri House of Representatives. Kinder and Troupe brought suit in their capacity as legislators and as Missouri taxpayers.

The organizational plaintiffs are: (1) The Coalition to Repeal Executive Order 01–09, an incorporated coalition of various associations and individuals, including all of the other plaintiffs; (2) The Missouri Chamber of Commerce, a state-wide business organization that represents approximately 3,000 employers and almost 200 local chambers in dealings with the Missouri General Assembly and other governmental entities; (3) The Missouri Municipal League, a not-for-profit corporation that is a wholly-owned instrumentality of 618 Missouri municipal governments; (4) The Associated Industries of Missouri, a corporation representing businesses that operate in Missouri and/or sell to Missouri customers; and (5) The Heartland of America Chapter of Associated Builders and Contractors, Inc., a not-for-profit corporation representing independent construction contractors that operate in Missouri. Each of these organizations also brought suit as a taxpayer itself and as a representative of individual taxpayers that comprise the organization.

The five individual plaintiffs are state employees. Gary Gross is an employee of the Missouri Department of Corrections; Lori Etter and Laura Powell are employees of the Department of Revenue; Earl Buck is an employee of the Department of Natural Resources; and Mary Hoffmeyer is an employee of the Division of Employment Security (which is a division within the Department of Labor and Industrial Relations). The individual plaintiffs brought suit as taxpayers and as state employees since they would be subject to the Order in that they work for departments or agencies under the direct control of the Governor. Finally, Paula Shields brought suit as an individual taxpayer and as president of the Missouri State Teachers Association.

The plaintiffs' amended four-count petition sought a declaratory judgment under § 527.010 and Rule 87.10. The counts alleged that the Order: (1) is invalid due to its lack of constitutional authority; (2) is invalid because provisions of the Order conflict with statutory and constitutional provisions; (3) threatens a taking of property in violation of the Civil Rights Act, 42 U.S.C. § 1983;[2] and (4) threatens to deprive the plaintiffs of open access to courts in violation of 42 U.S.C. § 1983.

The Governor filed a motion to dismiss the plaintiffs' petition for failure to state a claim arguing that plaintiffs lacked standing, that the claims were not ripe for judicial review, and that the claims involve non-justiciable political questions.[3] On December 17, 2001, the trial court granted the Governor's motion to dismiss, holding that: (1) as to Counts I and II, the plaintiffs lack standing to bring their claims; (2) even if plaintiffs had standing, the court would still dismiss Counts I and II because the executive order is within the Governor's discretion and authority and, therefore, is not actionable; and (3) as to Counts III and IV (§ 1983 claims), plaintiffs' claims are not ripe. The order dismissed all the claims with prejudice.

On January 14, 2002, plaintiffs filed a motion to amend the order/judgment and to reinstate their petition and for leave to file a first amended petition. The plaintiffs argued that a number of events had transpired since their original petition had been filed that would bolster their case with regard to standing and ripeness. On February 7, 2002, the trial court denied plaintiffs' motion; however, the dismissal

was changed from "with prejudice" to "without prejudice."

## II. Jurisdiction

### A. Initial Jurisdiction

■ It is incumbent on this court to determine its jurisdiction *sua sponte* before reaching the merits of this appeal. Article V, section 3, of the Missouri Constitution grants exclusive appellate jurisdiction of all cases involving the validity of a statute or of a provision of the constitution of the state in the Supreme Court of Missouri, while reserving to the Court of Appeals general jurisdiction in all cases not within the supreme court's exclusive jurisdiction. Since plaintiffs' first two points raise the issue of the constitutionality in whole or in part of an executive order, it must first be determined if these issues fall within the exclusive jurisdiction of the Supreme Court.

This court finds that jurisdiction initially lies here because the Missouri Constitution has not specifically directed cases regarding the determination of the constitutionality of executive orders to go directly to the Supreme Court of Missouri. In *Alumax Foils Inc. v. City of St. Louis*, 939 S.W.2d 907 (Mo. banc 1997), the Supreme Court examined jurisdiction in a case involving whether a municipal ordinance calling for licensing fees for utility service constituted a state revenue law and, therefore, fell within the ambit of their exclusive jurisdiction under article V, section 3, of the Missouri Constitution. Apropos to the appeal of the constitutionality of an executive order, the court stated the constitutional pro-

---

**2.** Counts III and IV relate to the Coalition to Repeal Executive Order 01–09, Powell, Buck, Gross, Hoffmeyer and Etter.

**3.** Although this argument implicates the political question doctrine (a limitation on the judiciary to resolve issues decidedly political

in nature), *Maryland Heights Leasing, Inc. v. Mallinckrodt, Inc.*, 706 S.W.2d 218, 220 (Mo. App.1985), the trial court did not rule on this issue and the doctrine is neither relevant nor applicable to the decision here.

vision, "is limited to claims the state law *directly* violates the constitution—either facially or as applied. Claims that municipal ordinances are constitutionally invalid are not within the exclusive jurisdiction of this Court." *Id.* at 912. The same rationale was applied in reaching a jurisdictional determination in a case dealing with the election of a county recorder of deeds. In *State v. Olvera,* 969 S.W.2d 715, 716 (Mo. banc 1998), the court stated that appellate jurisdiction under article V, section 3, mandates Supreme Court jurisdiction in cases where "title to any state office" is at stake, but does not apply to a county recorder's office. The court in *Olvera* subsequently transferred the case to this court. *See also State ex rel. McCulloch v. Hoskins,* 978 S.W.2d 779, 780 (Mo.App.1998) (duties of mayor were not co-extensive with boundaries of state and, therefore, the appeal did not involve title to state office). The next jurisdictional issue that must be addressed is whether the judgment is final and appealable.

## B. Judgment is Final and Appealable

 Generally, a dismissal of a petition without prejudice is not a final judgment and therefore is not appealable. *Doe v. Visionaire Corp.,* 13 S.W.3d 674, 676 (Mo.App.2000). "An exception to this general rule is that an appeal can be taken where the dismissal has the practical effect of terminating the litigation in the form cast by the plaintiff." *Masonic Temple Ass'n of St. Louis v. Soc'y for Pres. of Masonic Temple,* 70 S.W.3d 24, 26 (Mo. App.2002). "If the dismissal was such that re-filing of the petition at that time would have been a futile act, then the order of dismissal is appealable." *Id.*

Some cases in which petitions are dismissed without prejudice for failure to state a claim are found to be final and appealable. This is usually because the dismissal had the practical effect of terminating the action. *Chromalloy Am. Corp. v. Elyria Foundry Co.,* 955 S.W.2d 1, 4 (Mo. banc 1997)(re-offering the same rejected claims to support plaintiff's claim that business was transacted in Missouri as support for a new contention that a contract was formed in Missouri in regard to personal jurisdiction would be an exercise in futility); *Osuji v. Mo. Dep't of Soc. Services, Div. of Family Services,* 34 S.W.3d 251, 253 (Mo.App.2000)(petitioner seeking removal and destruction of social service records was entitled to appeal dismissal of petition without prejudice, where court's dismissal signaled end of petitioner's action and futility of refiling, and dismissal had practical effect of terminating litigation and foreclosing petitioner from immediate relief).

In *Masonic Temple Ass'n of St. Louis,* 70 S.W.3d 24, as here, the dismissal without prejudice was based on a lack of standing. The Masonic Temple Association of St. Louis ("Temple") was the legal titleholder of a temple building. The Temple alleged in its petition that the Society for Preservation of Masonic Temple ("Society") had breached its duty to support and maintain the temple building, committed fraud, and had breached a lease contract. The petition was also filed against the Attorney General because the Temple alleged that a public interest was involved.

After the Temple was allowed to file a second amended petition, the Society and the Attorney General filed motions to dismiss for lack of standing and for failure to state a cause of action based on lack of standing. The trial court granted the motions and dismissed the Temple's second amended petition. It did not indicate whether the dismissal was with or without prejudice. Under Rule 67.03, unspecified dismissals are treated as without preju-

dice. The Temple appealed from the trial court's dismissal of its petition.

The court in *Masonic Temple* used a two-step analysis to determine whether the judgment was final and appealable. First, it looked at whether the dismissal had the practical effect of prohibiting the plaintiffs from filing another action. *Id.* at 26. Although the court acknowledged that a dismissal without prejudice based on lack of standing has been held to have the practical effect of prohibiting the plaintiffs from filing another action, it did not find the case to be one of those situations. Second, the court in *Masonic Temple* determined if the Temple could properly state claims upon which relief may be granted in another petition. *Id.* at 27.

Here, the petition was dismissed by the trial court because: (1) plaintiffs lacked standing as to Counts I and II; and, even if they had standing, the Executive Order was within the Governor's discretion and not actionable; and (2) plaintiffs claims as to Counts III and IV were not ripe. The dismissal here had the practical effect of terminating the litigation. Although the plaintiffs sought leave to amend their petition, the amendment would have only "assert[ed] new violations of law unknown at the time of the original pleading and additional facts supporting the ripeness of plaintiffs' claims and their standing to assert those claims." Plaintiffs would not have asserted any new facts on the substantive issue of the Governor's discretion and authority to issue the Order. As such, the trial court's finding that "the Executive Order is within the Governor's discretion and authority" had the effect of terminating the litigation regardless of the outcome of the standing and ripeness issues. Thus, this court finds that the trial court's judgment is final and appealable.

## III. Analysis

### A. Standard of Review

■ When reviewing an appeal from the grant of a motion to dismiss, this court looks to determine if the facts, as pleaded, and the reasonable inferences drawn from the facts, state any grounds for relief. *Arnold v. Am. Family Mut. Ins. Co.*, 987 S.W.2d 537, 539 (Mo.App.1999).

### B. Points On Appeal

Plaintiffs assert four points on appeal: (1) the trial court erred in dismissing Counts I and II of plaintiffs' petition for failure to state a claim because the Order is subject to judicial review in that it was not within the Governor's discretion and authority to issue; (2) the trial court erred in dismissing Counts I and II of plaintiff's petition because the plaintiffs did not lack standing to pursue these claims in that plaintiffs have a personal interest in this dispute in their capacities as taxpayers, employees, legislators, and representatives; (3) the trial court erred in dismissing Counts III and IV of plaintiffs' petition because the claims are ripe for judicial review in that the individual plaintiffs have been threatened with the deprivation of their civil rights; and (4) the trial court erred in denying plaintiffs' request for leave to amend their petition because leave should have been granted freely under Rules 55.33 and 67.06 in that new facts have occurred since plaintiffs filed their petition. Because a party who lacks standing may not seek a declaratory judgment action, the standing issues in this case must be addressed first. *State ex rel. Nixon v. American Tobacco Co.*, 34 S.W.3d 122, 132 (Mo. banc 2000).

### C. Standing

■ "Reduced to its essence, standing roughly means that the parties seeking relief must have some personal interest at

stake in the dispute, even if that interest is attenuated, slight or remote." *Ste. Genevieve Sch. Dist. R–II v. Bd. of Alderman,* 66 S.W.3d 6, 11 (Mo. banc 2002)(citing *Raines v. Byrd,* 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)). Standing is related to the doctrine which prohibits issuance by courts of advisory opinions. *State ex rel. Williams v. Marsh,* 626 S.W.2d 223, 227 (Mo. banc 1982). Appellate review of whether a litigant has standing is *de novo. Home Builders Ass'n of Greater St. Louis, Inc. v. City of Wildwood,* 32 S.W.3d 612, 614 (Mo.App.2000). This court determines standing as a matter of law on the basis of the petition, "along with any other non-contested facts accepted as true by the parties at the time the motion to dismiss was argued." *Id.*

■ "In the context of an action for declaratory judgment, Missouri courts require that the plaintiff have a legally protectable interest at stake in the outcome of the litigation." *Ste. Genevieve Sch. Dist.,* 66 S.W.3d at 10 (citing *Battlefield Fire Prot. Dist. v. City of Springfield,* 941 S.W.2d 491, 492 (Mo. banc 1997)). "A legally protectable interest exists if the plaintiff is directly and adversely affected by the action in question or if the plaintiff's interest is conferred by statute." *Id.*

### 1. Taxpayer Standing

■ "[I]n order to have standing, a taxpayer must demonstrate either: (1) a direct expenditure of funds generated through taxation, (2) an increased levy in taxes, or (3) a pecuniary loss attributable to the challenged transaction of a municipality." *American Tobacco Co.,* 34 S.W.3d at 132 (citing *E. Mo. Laborer's Dist. Council v. St. Louis County,* 781 S.W.2d 43, 47 (Mo. banc 1989)). A taxpayer "need only

show 'that [his] taxes *went or will go* to public funds that *have or will be* expended due to the challenged action.'" *Nat'l Solid Waste Mgmt. Ass'n. v. Dir. of Dep't of Natural Res.,* 964 S.W.2d 818, 819 (Mo. banc 1998) (emphasis added). As stated in *Eastern Missouri Laborer's,* 781 S.W.2d at 46–47:

> The primary basis for taxpayer suits arises from the need to ensure that government officials conform to the law. It rests upon the indispensable need to keep public corporations, their officers, agents and servants strictly within the limits of their obligations and faithful to the service of the citizens and taxpayers.... Public policy demand a system of checks and balances whereby taxpayers can hold public officials accountable for their acts.

■ The private injury that invests standing to a taxpayer is not a purely personal grievance in which other taxpayers have no interest, rather it is an injury shared by the public. *Querry v. State Highway & Transp. Comm'n,* 60 S.W.3d 630, 635 (Mo.App.2001).

In order for plaintiffs to have taxpayer standing in this case they must show that a direct expenditure of funds generated through taxation "went or will go to public funds that have or will be expended due to the challenged action."[4]

■ The plaintiffs allege in their petition that the Governor and the State are presently expending state funds to implement the Executive Order. The plaintiffs claim that state funds have already been used to retain a law firm to advise the Governor on the implementation of the order, to create a state web page, and to

---

**4.** Plaintiffs did not allege a pecuniary loss attributable to the challenged transaction or

an increase levy of taxes.

finance preparation of numerous press releases and informational packets concerning the executive order. Plaintiffs also claim that the Executive Order will require government agencies to "spend and to commit to spend monies collected through the taxation process in manners which are improper, unauthorized and contrary to law." Paragraph 2(b) of the Order states that the cost of arbitration will be "borne equally by the two parties." Thus, the plaintiffs allege in their petition that a direct expenditure of state funds has been made to implement the Executive Order and will be made in the future, at least with regard to arbitration costs.

■■■ When reviewing the dismissal of a petition for failure to state a claim, this court treats the facts contained in the petition as true and construes them liberally in favor of the plaintiffs. *Ste. Genevieve Sch. Dist. R–II*, 66 S.W.3d at 11. No attempt is made to weigh any facts alleged as to whether they are credible or persuasive. *Johnson ex rel. Wilken v. Jones*, 67 S.W.3d 702, 705 (Mo.App.2002). "Instead, the petition is reviewed in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case." *Id.*

The allegations in the petition concerning the direct expenditure of state funds are sufficient to confer taxpayer standing to plaintiffs. Since all of the plaintiffs have alleged taxpayer status, it is unnecessary to address the other types of standing alleged by them.[5] *Nat'l Solid Waste Mgmt. Ass'n.*, 964 S.W.2d at 819 (citing *Mo. Coalition for the Env't v. Joint Comm. on Admin. Rules*, 948 S.W.2d 125, 132 (Mo. banc 1997)). With the plaintiffs'

standing established, it must be determined whether plaintiffs can maintain their declaratory judgment action.

## D. Declaratory Judgments

■■■ The plaintiffs' requested declaratory relief under section 527.010 *et seq.* (the "Declaratory Judgment Act"), which authorizes a party to seek a declaratory judgment to establish the rights, status, and duties of parties so as to avoid loss and encourage settlement of disputes before litigation. *Wheeler v. Sweezer*, 65 S.W.3d 565, 568 (Mo.App.2002). The trial court is afforded wide discretion in administering the Declaratory Judgment Act. *George v. Brewer*, 62 S.W.3d 106, 109 (Mo. App.2001). "Declaratory judgment actions should not be resorted to for the purpose of giving advisory opinions." *Farm Bureau Town & Country Ins. Co. of Mo. v. Angoff*, 909 S.W.2d 348, 353 (Mo. banc 1995).

■■■ "[I]n order to maintain a declaratory judgment action a petitioner must satisfy four requirements." *Northgate Apartments, L.P. v. City of North Kansas City*, 45 S.W.3d 475, 479 (Mo.App. 2001). First, there must be a justiciable controversy. *Id.* "A justiciable controversy" "presents a real, substantial, presently-existing controversy as to which specific relief is sought, as distinguished from an advisory decree offered upon a purely hypothetical situation." *Id.* "Second, the petitioner must demonstrate a legally protected interest consisting of a pecuniary or personal interest directly at issue and subject to immediate or prospective consequential relief." *Id.* Third, the issue presented must be ripe for judicial determination. *Id.* "A mere difference of opinion

---

**5.** It appears from the holdings in *Raines v. Byrd*, 521 U.S. 811, 117 S.Ct. 2312 (1997), and *State ex rel. Mathewson v. Bd. of Election Comm'rs of St. Louis County*, 841 S.W.2d 633 (Mo. banc 1992), that Senator Kinder and Representative Troupe would not have had standing if they had filed the petition in only their official capacities.

or disagreement on a legal question is insufficient, but parties must show that their rights and liabilities are affected." *Akin v. Dir. of Revenue,* 934 S.W.2d 295, 298 (Mo. banc 1996)(citing *Tietjens v. City of St. Louis,* 359 Mo. 439, 222 S.W.2d 70, 71–72 (1949)). Finally, "[a] petitioner who satisfies all three of these elements must also demonstrate that he or she does not have an adequate remedy at law." *Northgate,* 45 S.W.3d at 479.

### E. Executive Order 01–09 is not Legally Actionable

 This now brings the court to a discussion of the issues at the heart of the case: (1) do the plaintiffs present a justiciable controversy for this court's consideration; and (2) does the Order have sufficient constitutional or statutory underpinnings to be enforced by a court of law?

Plaintiffs argue that the trial court erred in dismissing Counts I and II of their petition for failure to state a claim because the Order is subject to judicial review in that it was not within the Governor's discretion and authority to issue.

 The trial court found that the plaintiffs lacked standing; but even if plaintiffs did have standing, the court would still dismiss Counts I and II because the Order was within the Governor's discretion and authority and, therefore, not actionable. It must be noted that this court must affirm the dismissal " 'if it can be sustained on any ground which is supported by the motion to dismiss, regardless of whether the circuit court relied on that ground.' " *State ex rel. Div. of Child Support Enforcement v. Hill,* 53 S.W.3d 137, 143 (Mo.App.2001)(quoting *Keys v. Nigro,* 913 S.W.2d 947, 951 (Mo.App. 1996)). In fact, " '[i]f the court correctly dismissed the [motion], the ground upon which the dismissal was based is immateri-

al.' " *J.M. Morris Constr. Co. v. Mid-West Precote Co.,* 613 S.W.2d 180, 181 (Mo.App.1981).

Although the trial court dismissed the cause for lack of plaintiff standing, its alternative finding was that even if there were standing, the Order was within the Governor's discretion and authority and, therefore, not actionable. The trial court based its decision on this court's opinion in *Stein v. James,* 651 S.W.2d 624 (Mo.App. 1983). Since this court has found the trial court's ruling on standing was error, an examination of whether the Order was legally actionable and presented a justiciable controversy must be reviewed.

In *Stein,* the plaintiff brought suit to enjoin the Missouri Director of Revenue from terminating her as a fee agent. Stein's petition alleged that her constitutional rights had been violated because her termination had been based solely on the fact that she was affiliated with the Democratic party. Stein's petition also alleged that her termination was contrary to Governor Bond's Executive Order, which adopted standards of conduct for appointed officials and employees of the executive branch. One of these standards was that unless provided for by constitution or by statute, membership in a political organization, payment of dues to a political organization, and attendance at political events would not be a condition for appointment or employment. Stein claimed the order prohibited the Director of Revenue from terminating her as a fee agent solely for political reasons.

The trial court indicated that although it believed her termination was a violation of Stein's constitutional rights it was not necessary to make the decision on that ground. Instead, the trial court entered an injunction restraining her from being terminated as a fee agent, finding that her

termination violated the executive order. The director of revenue appealed. Because the judgment did not award attorney's fees, Stein cross-appealed.

This court held in the first portion of *Stein* that fee agents were not state employees; therefore, there was no prohibition against Stein being terminated for political reasons. *Id.* at 627. This court then went on in *Stein* to analyze the executive order issue which is pertinent to the case at bar.

▮▮▮▮▮ After commenting that executive orders are rarely the subject of judicial opinions,[6] this court applied the analysis of a Pennsylvania case, *Shapp v. Butera,* 22 Pa.Cmwlth. 229, 348 A.2d 910 (1975). The *Stein* opinion acknowledged that there are three categories of executive orders.[7] The first category consists of formal, ceremonial, and political orders. *Stein,* 651 S.W.2d at 628. These type of orders are usually issued as proclamations to declare some special day or week in honor of or in commemoration of some special thing or event and have no legal effect. *Shapp,* 348 A.2d at 913. The second category includes communications to subordinate executive branch officials regarding the execution of their executive branch duties. *Stein,* 651 S.W.2d at 628. This second category is also not legally enforceable, and the Governor could not seek a court order to enforce that aspect of the executive order. *Shapp,* 348 A.2d at 913. Rather, the executive order would only carry the implication of a penalty for noncompliance. *Id.* The third category consists of orders which implement or supplement the state's constitution or statutes. *Stein,* 651 S.W.2d at 628. The third category of executive orders have the force of law. *Shapp,* 348 A.2d at 913. *Shapp* gives the example of the Governor issuing an executive order based on article IV, section 10 of the Pennsylvania Constitution which states that the Governor may require information from officers of the Executive Department regarding any subject relating to the duties of their respective offices. *Id.* at 912. If the Governor issued an order requiring information from an officer of the Executive Department and such officer refused, the Governor could obtain a court order and the sanctions of noncompliance with a court order to enforce the executive order. *Id.* at 913. "The distinction between this third classification and the second classification is based upon the presence of some constitutional or statutory provision, which authorizes the executive order either specifically or by way of necessary implication."[8] *Id.*

This court agreed with the analysis contained in *Shapp,* and determined that

**6.** *See also* Tara L. Branum, *President or King? The Use and Abuse of Executive Orders in Modern–Day America,* 28 J. Legis. 1, 78–79 (2002).

**7.** *See Gubernatorial Executive Orders as Devices for Administrative Direction and Control,* 50 Iowa L.Rev. 78, 82–86 (1964); Benjamin S. Longlet, *Gubernatorial Executive Orders in Wisconsin: The Case for Judicial Enforcement,* 2000 Wis. L.Rev. 1323.

**8.** The court stated in *Stein:* "Because there is no constitutional or statutory provision authorizing Executive Order 81–2 and because it directs the execution of the duties of executive branch officials, it falls under the second class enumerated in *Shapp.* *Shapp* held that this category of executive orders is not legally enforceable and that the governor cannot seek a court order to enforce them. The *Shapp* court further concluded that noncompliance with this type of order would result only in a penalty such as possible removal from office, demotion or reprimand as to the executive branch official disobeying the rule." 651 S.W.2d at 628.

"[a]bsent some constitutional or statutory basis for an executive order, it cannot be considered more than a directive from the governor to his subordinates in the executive branch for the carrying out of their official duties." *Stein*, 651 S.W.2d at 628. The court in *Stein* concluded that because the executive order in that case lacked a constitutional or statutory basis, it did not create a legal cause of action. *Id.*

The Executive Order at issue in this case falls within the second classification of executive orders because there are no constitutional or statutory provisions which authorize the Order either specifically or by implication. This conclusion becomes apparent when compared to the similar factual scenario in *McCulloch v. Glendening*, 347 Md. 272, 701 A.2d 99 (1997). Although the executive order in *McCulloch* was not categorized by the court in that case, it seems clear that it would have been considered in the third classification of executive orders that have the force of law due to the constitutional and statutory provisions authorizing it.

In *McCulloch*, Maryland taxpayers filed a complaint and request for declaratory and injunctive relief, seeking to prevent the implementation of an executive order granting unionization and collective bargaining rights to executive branch employees. Some of the issues raised in *McCulloch* were: (1) whether the executive order issued by the Governor of Maryland exceeded his power to issue executive orders; (2) whether he had the constitutional and statutory authority to issue the order; and (3) whether the issuance of the order violated Maryland's constitutional separation of powers doctrine.

First, the Court in *McCulloch* found that the Governor's executive power was expressly provided in the Maryland Constitution. Article II, section 1, vests the executive power of the state in the Governor, including the execution of the laws of Maryland, and Article II, section 9, directs the Governor to take care that the laws are faithfully executed. *McCulloch*, 701 A.2d at 104. Further, Article II, section 24, gives the Governor broad authority to reorganize and reassign functions among executive branch agencies. *Id.* at 105. It provides, in pertinent part:

> The Governor may make changes in the organization of the Executive Branch of the State Government, including establishment or abolition of departments, offices, agencies, and instrumentalities, and the reallocation or reassignment of function, powers, and duties among the departments, offices, agencies, and instrumentalities of the Executive Branch. *Where these changes are inconsistent with existing law, or create new governmental programs they shall be set forth in executive orders in statutory form which shall be submitted to the General Assembly* within the first ten days of regular session.[9]

*Id.* at 105 (Emphasis added).

Second, the Court in *McCulloch* found that Maryland's statutory scheme concerning the executive branch gave the Governor a significant role in setting policies to govern the management and supervision of Maryland employees. "[Section] 3–302 of the State Govt. Article, entrusted to the Governor the power to establish personnel policies and to require executive agency

---

**9.** "Section 8–301 of the State Government Article states that '[i]n addition to any reorganization under Article II, § 24 of the Maryland Constitution, the Governor may order any other reorganization of the Executive Branch that is considered by the Governor to be necessary and desirable and that is not inconsistent with the law.'" *McCulloch,* 701 A.2d at 105.

heads to carry out those policies." *Id.* at 105. Section 3–302 states that the Governor is the head of the executive branch of Maryland's government and, except as otherwise provided by law, "shall supervise and direct the officers and units in the executive branch." *Id.* McCulloch also lists executive orders the Maryland legislature has authorized the Governor to issue in § 2–101 and § 3–401(2), (3) and (4), which include:

(1) proclaims or ends a state emergency, under Article 41, § 2–101 of the Code;

(2) adopts guidelines, rules of conduct, or rules of procedure for:

(i) State employees;

(ii) units of the State government; or

(iii) persons who are under the jurisdiction of those employees or units or who deal with them;

(3) establishes a unit, including an advisory unit, study unit, or task force; or

(4) changes the organization of the Executive Branch of State government.

The court in *McCulloch* determined that given the breadth of the authority that the Legislature had bestowed on the Governor in the statutes cited *supra*, a strong argument could be made that the executive order could be upheld on the statutory authority alone. "In any event, when the statutory and constitutional provisions are considered together, it becomes crystalline that the Governor has broad power and authority over Executive Branch employees and their working conditions." *Id.*[10] As such, it is easy to conclude that had the executive order in *McCulloch* been catego-

rized, it would have been considered in the third category. Whereas the court in *McCulloch* found Maryland's Constitution and statutes to be "crystalline" as to the Governor's power and authority to issue an executive order concerning executive branch employees and their working conditions, this court's research shows that Missouri's Constitution and statutes are virtually silent in this regard.

The Governor's executive power is expressly provided in the Missouri Constitution. Article 4, section 1, provides that "The supreme executive power shall be vested in a governor[;]" and article 4, section 2, states that: "The governor shall take care that the laws are distributed and faithfully executed, and shall be a conservator of the peace throughout the state."

As for statutory authority, section 105.969.1, which gives the Governor the authority to adopt by executive order a code of conduct applicable to state employees of the executive branch on or before February 1, 1992, is the only provision in § 105.500 *et seq.*, the Public Sector Labor Law, that gives the Governor any express statutory authority to issue executive orders concerning executive branch employees and their working conditions.

In regard to reorganization plans such as the one analyzed in *McCulloch*, section 26.500 authorizes the Governor to submit plans for the reorganization of executive agencies. A reorganization plan submitted would become effective by executive order unless it is disapproved by the legislature. § 26.510. As stated *supra*, however, the Maryland Legislature grant-

---

**10.** It was ultimately held in *McCulloch* that the executive order met Maryland's constitutional and statutory requirements and was not in violation of the separation of powers. The Governor's broad authority to issue executive orders for the guidance and direction of units and employees of the executive branch "nec-

essarily permits the promulgation of an executive order authorizing the limited collective-bargaining rights for Executive Branch employees contained in the subject Order. This act is an exercise of executive function, not a usurpation of legislative function." *Id.* at 106.

ed the Governor much more specific express statutory and constitutional power in this area than the Missouri legislature. Furthermore, in *Moore v. Pelzer*, 710 S.W.2d 416, 421 (Mo.App.1996), this court commented that neither a reorganization plan for state government nor an executive order issued by the Governor in approval of such a plan "ever attains the status of a law within the meaning of article. III, § 21."[11] Indeed, executive orders must be "*within* the grant of authority from the General Assembly." *Rider v. Julian*, 365 Mo. 313, 282 S.W.2d 484, 489 (banc 1955). *See also Pagano v. Pa. State Horse Racing Comm'n*, 50 Pa.Cmwlth. 499, 413 A.2d 44, 45 (1980)(Governor may issue executive orders absent constitutional or statutory authority; however, such executive orders will not be enforced by the courts). It must be noted that the Order in this case contained language clearly recognizing that legislative approval and/or appropriations will be needed on certain matters addressed in the Order.

The purpose of the comparison between the case at bar and *McCulloch* is to show the distinction between an executive order that clearly is in the third category of executive orders because it was authorized by constitutional and statutory authority, and an executive order such as the one here that clearly is not. *See also Nass v. State ex rel. Unity Team, Local 9212*, 718 N.E.2d 757, 763 (Ind.Ct.App.1999)(Gover-

nor's authority to issue executive orders regulating the terms and conditions of employment for executive branch employees is inherent in a number of statutes).

Based upon the foregoing analysis, this court finds that Executive Order 01–09 is merely a category two directive order and, therefore, not legally actionable. *Stein*, 651 S.W.2d at 628. As such, the plaintiffs cannot maintain this suit and alternatively, the Governor could not seek a court order to enforce Executive Order 01–09. *See Id.*

■ This is not to say that all executive orders issued by the Governor fall within the second category and are not legally actionable. For example, article IV, section 6, of the Missouri Constitution provides that, "The governor shall be the commander in chief of the militia, except when it is called into the service of the United States, and may call out the militia to execute the laws, suppress actual and prevent threatened insurrection, and repel invasion." Section 41.480 also provides that the Governor may call out the militia when, in his opinion the circumstances so warrant.[12] Thus, "the power to decide whether a public exigency exists such as justifies the calling out of the militia is vested solely in the Governor." *McKittrick ex rel. Donaldson v. Brown*, 337 Mo. 281, 85 S.W.2d 385, 388 (1935). If the Governor were to issue an executive order[13] calling up the Missouri military reserves due to a public emergency, the or-

---

**11.** Article III, § 21 states: "The style of law shall be: 'Be it enacted by the General Assembly of the State of Missouri, as follows.' No law shall be passed except by bill, and no bill shall be so amended in its passage through either house as to change its original purpose. Bills may originate in either house and may be amended or rejected by the other. Every bill shall be read by title on three different days in each house."

**12.** *See also* Section 41.040, "The militia of the state of Missouri, which includes the adjutant

general and his office, constitutes the military division of the executive department of the state government, under the direct control of the governor;" *See also State ex rel. Danforth v. Kansas City Firefighters Local No. 42*, 585 S.W.2d 94, 97 (Mo.App.1979).

**13.** An executive order of the governor is required to direct the organization of the Missouri reserve military force, Mo.atty.gen.op. no. 30 (Oct. 18, 1982)(available at 1982 WL 185870).

der would be a type three order and would be enforceable in court because the Governor has constitutional and statutory authority to issue such an executive order.

As stated *supra*, the law pertaining to declaratory judgment actions based on executive orders is sparse; statutory and constitutional declarations on the matter are virtually non-existent. In fact, as pointed out in the Wisconsin Law Review article cited in footnote seven, the dearth of law on enforcement of executive orders makes it unclear "when, if ever, a Wisconsin gubernatorial executive order is judicially enforceable." Had this court not adopted the analyses of the three types of orders in *Stein*, such a differentiation would have to be established.

Although the Order here utilizes mandatory-style language as to the bargaining scheme and resulting contract, it is still nothing more than a directive from the chief executive (sans constitutional or legislative approval) to his appointed executive department head. Thus, in effect it is a type two directive. The court in *Shapp*, the case that formed the foundation for *Stein*, stated that, had the Governor in that case attempted to issue an order pursuant to a section of the Constitution or a section of a statute, "a different question might have been presented." 348 A.2d 910, 914, 22 Pa.Cmwlth. at 237. Although the Governor does have authority to deal with departments and agencies under his direct control, a Missouri Governor does not have constitutional or statutory authority to set up a mechanism which results in a state employee collective bargaining agreement which must be acted upon or paid for by the appropriation process. Despite intent or language, this Order is not actionable because it lacks constitutional or statutory authority. Even if the deferential language in the Order as to legislative action and funding were not present, this order lacks the underpinnings to be a type three order; it is not enforceable and the court's duty is to dismiss this suit.

## F. Whether Claims Were Ripe For Employee

## Section 1983 Actions Is Also Questionable

■ Because the Order was not legally actionable, plaintiffs did not set forth a justiciable controversy and the trial court was correct in dismissing the case because a legal cause of action could not be maintained against the Order. Since the plaintiffs failed to set forth a justiciable controversy it is not necessary to review the cause for the other elements of a declaratory judgment. *Northgate Apartments*, 45 S.W.3d at 479. It is, however, worth mentioning that even if the Order were somehow determined to be a category three order, whether the Section 1983 claims asserted by the employee plaintiffs were ripe is questionable. *See Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 241 (Mo. banc 2001)(the state's attempted enforcement of statute made controversy ripe); *Mo. Health Care Ass'n v. Attorney Gen.*, 953 S.W.2d 617 (Mo. banc 1997)(ripe controversy existed for a trade organization to challenge constitutionality of an amendment to a statute because the amendment altered the way members of a trade organization had to perform their businesses or face penalties); *Tietjens*, 359 Mo. 439, 222 S.W.2d 70(fact that city was not prepared to enforce an ordinance or that the plaintiffs had not actually violated the ordinance did not make the action premature); *City of St. Louis v. Milentz*, 887 S.W.2d 709, 711 (Mo.App.1994)(issue of city's official immunity in enforcing a statute and city ordinance was ripe); *Akin v. Dir. of Revenue*, 934 S.W.2d 295 (Mo. banc 1996)(taxpayers' challenge to the constitutionality of a statute under which they

were being required to pay taxes was ripe for adjudication). *But See Buechner v. Bond,* 650 S.W.2d 611, 614 (Mo. banc 1983)(constitutional challenge to the Hancock Amendment was not ripe for adjudication because no refund under the Amendment was imminent); *Local 781 Int'l Ass'n of Fire Fighters v. City of Independence,* 947 S.W.2d 456, 461 (Mo.App.1997)(issue of whether proposed revisions to city charter were constitutional was not yet ripe for judicial review);

Count III of the petition contained allegations by the employee plaintiffs and the Coalition to Repeal of several unconstitutional takings pursuant to the Order which would result in damages cognizable under 42 U.S.C. § 1983. Count III mentioned among other items, the potential for dues assessments, service fees, and possible loss of employment for failure to remit fees.[14] Count IV of the petition alleged the Order denied these same plaintiffs access to the courts in violation of Section 1983. The trial court found that the claims in Counts III and IV were not ripe, which gave rise to Point III on appeal. It is not necessary for this court to review Point III since the Order is not legally actionable.

### G. Leave to Amend Petition Correctly Denied

■ Point IV alleges an abuse of the trial court's discretion for failure to allow plaintiffs leave to amend their petition to include newly discovered facts. Point IV stems from the plaintiffs being unable to amend their petition to add facts pertaining to spending by the State (for a website and for legal advice) to implement the Order. The plaintiffs cite to Rule 55.33(a) and Rule 67.06 which permit liberal amendment. Point IV is denied because

no new facts were brought out which could have changed the Order from a non-actionable type two category of executive order into a type three.

### H. Conclusion

This court holds that: (1) although the dismissal in this case was without prejudice, the judgment was final and appealable since it had the practical effect of terminating the action; (2) the allegations in the petition concerning the direct expenditure of state funds were sufficient to confer taxpayer standing to plaintiffs; (3)(a) Executive Order 01–09 is a directive and falls within the definition of a type two order and is, therefore, not legally actionable because there are no constitutional or statutory provisions which authorized it either specifically or by implication; (3)(b) the outcome of this case does not depend upon the status of public employee collective bargaining under *Clouse* or its progeny because there is no authority for a Governor's executive order to have the force or effect of law on this subject; (4) since there is no justiciable controversy presented in the plaintiffs' case, the trial court was correct in dismissing their petition for declaratory judgment; (5) because the Order is not legally actionable, this court need not address the issues presented in Point III; and (6) Point IV is denied because the trial court correctly denied plaintiffs' motion to amend their petition because no new facts were brought out which could have changed the Order from a non-actionable type two category of executive order into a type three. The motions filed by both parties during the course of this appeal are denied. The judgment of the trial court is affirmed.

All concur.

---

**14.** Section 105.510 provides *inter alia,* that no employee can be compelled to join or refrain from joining a labor organization.

## APPENDIX

### EXECUTIVE ORDER

#### 01–09

WHEREAS, on the 7th day of April, 1998, Governor Carnahan issued a Memorandum pertaining to Unions representing State Employees; and

WHEREAS, on June 19, 2000, Governor Carnahan issued a Memorandum entitled "Addendum to Memorandum on Policies Relating to Unions Representing State Employees" issued on April 7, 1998; and

WHEREAS, I intend to incorporate and build upon the basic concepts of those Memoranda; and

WHEREAS, qualified and well-trained employees are vital to reducing the cost of government, improving its effectiveness and efficiency and achieving the goals of the State; and

WHEREAS, this Administration continues to be committed to the well-being of public employees of the State of Missouri and in continuing and improving good and meaningful relations with the unions that represent them; and

WHEREAS, this Administration continues to be committed to the establishment of a good-faith negotiation framework for the resolution of issues pertaining to all terms and conditions of employment;

NOW THEREFORE, I, BOB HOLDEN, Governor of the State of Missouri, by virtue of the authority vested in me by the Constitution and laws of the State of Missouri, do hereby order by virtue of this Executive Order as follows:

1. State departments and agencies within the Executive Branch and Certified Bargaining Representatives are expected to act in "good faith" when they meet and confer with each other. This requires both the certified bargaining representative and the State Department or Agency to approach negotiations with a sincere resolve to reach an agreement, requires both sides to meet at reasonable times and places to exchange information and to reduce to writing any item that is agreed to by both parties and requires both parties during the meet and confer process and at impasse on any issue involved in negotiation in a Memorandum of Understanding to adhere to the rules of the process contained herein. This Executive Order applies only to those State departments and agencies under the direct control of the Governor.

2. If, after sixty (60) days following the first meet and confer session between the parties in negotiations toward a Memorandum of Understanding, the parties have issues that are unresolved, then either party, through its representative, may, by written notification to the other party, notify said party of which issue or issues remain outstanding and of the notifying party's desire to proceed to impasse negotiation over said issues. The impasse negotiation procedure which State Departments and Agencies shall agree to shall consist of the following:

 (a) Assistance by an impartial third party agreed to by both sides to reconcile all impasse issues and, if the parties cannot agree on a third party, then either party may, by written request, submit unresolved issues to Mediation by the Federal Mediation and Conciliation Service established pursuant to 29 U.S.C. 172. Such mediation shall consist only of suggestions and non-binding advice to resolve the impasse; said impasse mediation negotiations shall commence, if possible, within (30) days after receipt of written notification by the non-notifying side.

 (b) If, after sixty (60) days from notification of the Federal Mediation and

Conciliation Service, certain issues still remain the subject of impasse, the remaining issues may, on the written request of either party, be submitted to Arbitration for a final and determinative recommendation. The Arbitrator shall be chosen from a panel of seven (7) qualified Arbitrators from Missouri, provided by the Federal Mediation and Conciliation Service through its standard procedures, with the State Department or Agency making the first strike until one name appears, which name shall be the Arbitrator for the parties involved in the dispute. The Arbitrator shall begin his hearings no later than thirty (30) days after the request for Arbitration in accordance with the procedures prescribed by the Board and the provisions of Sections 435.350 to 435.470, RSMo., except when Section 435.460 shall be applicable to said proceedings. The Arbitrator shall render a decision in writing no later than sixty (60) days after conclusion of the hearing. The cost of such Arbitration shall be borne equally by the two parties.

3. In making any recommendation pursuant to the impasse procedures authorized herein, the Arbitrator shall consider the following factors: (a) the effect of an agreement on the ability of the public body to provide public services at current levels; (b) the lawful authority of the public body; (c) the stipulations of the parties; (d) the interest and welfare of the public; (e) the financial ability of the public body to meet the costs of any items to be included in the contract; (f) a comparison of wages, hours and terms and conditions of employment of employees involved in the Arbitration proceedings with the wages, hours and terms and conditions of employment of other persons performing similar services in the public and private sector; (g) the average consumer prices for goods and services, commonly known as the cost of living or the consumer price index; (h) the overall compensation presently received by employees involved in the Arbitration, including, but not limited to wages, hours and terms and conditions of employment achieved through voluntary collective bargaining, mediation, fact-finding arbitration or otherwise.

4. All Memoranda of Agreement between State Departments and Agencies and Certified Bargaining Representatives shall contain a grievance procedure which shall apply to all disputes arising under the Memorandum of Agreement and which shall provide for final and binding arbitration for issues that may be legally binding under the Missouri Constitution and laws. Where resolution of any issues may not be final and binding under the Missouri Constitution and laws, then an Arbitrator must provide a written recommended resolution of all such disputes. No arbitration Award under this Section shall require any additional appropriation of funds and the Arbitrator's award shall be limited to an interpretation of terms of the Memorandum of Agreement.

5. After any negotiated agreement has been agreed to by a State Department or Agency and the exclusive bargaining representative of an appropriate unit of employees of that Department or Agency, any provision of the agreement which requires an additional appropriation of funds or which is found to be in conflict with the Missouri Constitution or laws shall take effect only on required approval of the appropriation of such funds or required legislative or Constitutional enactment. Any State Department or Agency which is governed by an autonomous board must have the approval of said autonomous board before a negotiated agreement is

deemed final. That portion of a final agreement which does not require additional action by the General Assembly and (sic) does not require additional action by the General Assembly and does not require additional funds not previously appropriated to be expended by the State Department or Agency and does not otherwise conflict with a statute or the Constitution shall take effect immediately upon the agreement being reduced to writing and signed by the parties to the agreement. In case of conflict between the provisions of this Order and any provision of the Missouri Constitution or laws, the provisions of the Missouri Constitution or laws shall prevail and control. If a recommendation submitted by an Arbitrator pursuant to Paragraph 2 herein is not enforceable because it requires additional action such as appropriation of funds or is otherwise contrary to law or requires action from the legislative or executive branch prior to becoming enforceable, then said recommendation shall be entered but shall be of no force and effect until such action is taken.

6. All State Departments and Agencies may, whenever appropriate and feasible in view of all the circumstances, include in applicable Memoranda of Agreement, a provision requiring that all bargaining unit members remit dues, fees assessments or services fees of any type to the Certified Bargaining Representative except to the extent that agreements between said State Departments and Agencies and the Certified Bargaining Representative shall not require as a condition of employment, the payment of a service fee in an amount greater than the dues which are payable by members of the employee organization to cover the cost of negotiation, contract administration, and other activities of the employee organization which are germane to its function as the Certified Bargaining

Representative. The Certified Bargaining Representative shall, as a condition of receiving such service fees, provide the following protections to persons required to pay such fees that object to paying all or a portion thereof:

(a) Notice, in writing, of the fee which will be payable, which may be expressed in a dollar amount or a percentage of the dues payable by members, and the basis upon which the Certified Bargaining Representative has determined such fee;

(b) An opportunity to challenge such determination and receive a prompt decision on such challenge by an impartial decision maker; and

(c) Escrowing of any portions of the service fee paid by a challenging bargaining unit member which is reasonably in dispute pending the determination.

Such an agreement may require the payment of a service fee commencing thirty (30) days after the beginning of employment or the effective date of such agreement, whichever is later. An Agreement entered into between the State Department or Agency and the Certified Bargaining Representative may include a provision for the checkoff of initiation fees and dues to the Certified Bargaining Representative or the payment of a service fee in lieu thereof as authorized in this paragraph.

7. Failure of the General Assembly to approve any portion of a Memorandum of Agreement previously agreed to, but which portion requires General Assembly approval to be valid, shall not constitute bad faith negotiation.

8. In the event that any provision of this order is deemed by a court of competent jurisdiction to be invalid or is invalidated by lawful action of the General Assembly, the remainder of this Order shall remain in full force and effect under general precepts severability.

9. Nothing contained herein shall be construed as encouraging or authorizing employees to strike or engage in any other illegal economic activity.