CITY COUNCIL of the CITY
OF READING

v.

Joseph D. EPPIHIMER, Mayor for the City of Reading, Jeffrey White, Managing Director for the City of Reading and David Cituk, City Auditor for the City of Reading,

Appeal of Joseph D. Eppihimer, Mayor for the City of Reading and Jeffrey White, Managing Director for the City of Reading.

Commonwealth Court of Pennsylvania.

Argued June 4, 2003.
Decided Nov. 17, 2003.

Leonard A. Busby, Philadelphia, for appellants.

Andrew N. Howe, Reading, for appellee.

BEFORE: PELLEGRINI, Judge, and COHN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN.

Joseph D. Eppihimer, Mayor of the City of Reading (Mayor), and Jeffrey White, Managing Director of the City of Reading (Managing Director),[1] appeal the order of the Court of Common Pleas of Berks County that granted the Complaint in Declaratory Judgment filed by the City Council of the City of Reading. The trial court held, *inter alia,* that City Council has the authority to create and fill the two newly created positions of City Council Chief of Staff and City Council Legislative Coordinator. Appellants claim that, in reaching this conclusion, the trial court violated explicit provisions of the Reading City Charter (Charter), Administrative Code and Personnel Code, deviated from the City's merit selection process and precluded the orderly and consistent adminis-

---

1. The Mayor and Managing Director will be referred to jointly in this opinion as "Appellants."

tration of employment practices for City government.

On the November 2, 1993 ballot, the citizens of Reading voted to implement a Home Rule Charter with a "Strong Mayor–Council Form of Government with a Managing Director" in order to "make the government of the City of Reading more responsive to the needs of the citizens of Reading...." (Report and Recommended Home Rule Charter for The City of Reading, July 1993, page VI.) The Charter took effect on the first Monday in January 1996. The City, subsequently, enacted an Administrative Code and a Personnel Code, pursuant to Charter Sections 601 and 703.

The Charter specifically authorizes City Council to hire a "City Clerk" who is an exempt employee,[2] and subject only to the authority of City Council. City Council decided to create two new staff positions, which are not specified in the Charter: Chief of Staff and Legislative Coordinator.[3] Therefore, City Council included funding for these two new positions in the 2002 Fiscal Year Budget Ordinance and also amended the 2002 Full Time Position Ordinance to refer to the new positions. The Mayor vetoed both ordinances when City Council submitted them for his approval. City Council overrode the Mayor's vetoes.[4] It then filed an Amended Com-

the amended ordinance, but City Council overrode the Mayor's veto. (¶¶ 15–16.) Following the enactment of the amended ordinance, job descriptions were created for the two positions and, shortly thereafter, City Council appointed Linda Kelleher (City Clerk) to the position of Chief of Staff. (¶¶ 17, 18.) Ultimately, however, the Mayor's Budget, and not City Council's Budget, became the Official Fiscal Year 2001 Budget for the City pursuant to a court order dated March 28, 2002. In the order, the trial judge noted that City Council's pre-adoption Budget Amendment triggered the resubmission requirements of Section 905(b) of the Charter, which were subsequently not followed. Section 905(b) states: "If the amended Budget increases, decreases, or readjusts funding requirements by more than five (5) percent, or adds or deletes a program, the Budget shall be returned to the Mayor immediately for comment and resubmission to the Council within three (3) normal City work days."

In the last quarter of 2001, City Council passed the fiscal year 2002 Operating Budget and a Full Time Employee Position Ordinance with Amendments, which included a continuation of the two aforementioned positions for City Council. (¶¶ 23–24, 26.) The Mayor vetoed both the budget and the ordinance, and City Council overrode the Mayor's vetoes. (¶¶ 28–29.) Notwithstanding, the Mayor and Managing Director "refused and continue[d] to refuse" to recognize those portions of the budget package which created and funded the positions for City Council. (¶ 30.) The Mayor

2. An exempt employee is not subject to the City's merit personnel system. *See* Footnote 8 for further discussion.

3. The Chief of Staff is to "serve[ ] as the chief administrative officer of City Council. This position performs highly responsible work involving the general oversight and coordination of Council's legislative action, policy, program and project management, procedure and operations ... and is responsible for making recommendations to Council relating to policy, regulations, practices, and issues concerning the City of Reading." (Job Description, January 25, 2001.) The Chief of Staff supervises the Legislative Coordinator and the City Clerk, and is to report to City Council. *Id.* The Legislative Coordinator performs administrative work of a confidential nature for City Council and the Chief of Staff, and reports to both. (Job Description, January 18, 2001.) Other responsibilities include "considerable public contact in dealing with City organizations, elected officials, and department directors and coordinating Council's initiatives and direction with the aforementioned." *Id.*

4. Based on allegations in City Council's Amended Complaint in Equity, this process actually began in December, 2000, when City Council submitted the 2001 Amended Full Time Position Ordinance to the Mayor for approval. (¶ 13.) This amended ordinance, in relevant part, is where they first created the positions of Chief of Staff and Legislative Coordinator. (¶¶ 13, 14.) The Mayor vetoed

plaint in equity with the Court of Common Pleas of Berks County alleging that the Mayor and Managing Director unlawfully refused to recognize the two new positions created by City Council. City Council sought declaratory relief that, *inter alia,* Council validly created the two positions; the Mayor and Managing Director were to take any and all actions necessary to effect the subsequent creation and staffing of such positions; City Council validly hired Linda Kelleher to fill the Chief of Staff position; and, relevant portions of the 2001 and 2002 Amended Full Time Employee Position Ordinances were valid and binding upon the Mayor and Managing Director. The trial court entered an order granting City Council's Request for Declaratory Judgment. The judge held that City Council properly created and funded the two positions pursuant to its budgetary authority under Section 221 and Article IX of the Charter. Appellants do not challenge this portion of the trial court's holding on appeal. However, the judge also held that the doctrine of separation of powers dictates the conclusion that, in the home rule form of governance in existence in the City of Reading, City Council has the authority to hire and fire with regard to these two staff positions. Appellants disagree, and it is this portion of the holding that is the subject of their appeal.

█ We are presented with the following issues for our review: (1) whether the Mayor and Managing Director alone possess administrative and executive authority over Reading's merit personnel system;

(2) whether the Charter authorizes City Council to appoint ONLY the City Clerk; (3) whether the employment authority of the Mayor and Managing Director is confined to the "Administrative Service" or "Administrative Branch"; and (4) whether the separation of powers doctrine requires that City Council have the power to hire and fire for these two positions.[5]

█ The issues must be addressed in the context of the City's Home Rule Charter, as it is the controlling document in this case. The Charter was enacted pursuant to the Home Rule Charter and Optional Plans Law (HRC & OPL), 53 Pa.C.S. §§ 2901–3171. Section 2961 of the HRC & OPL sets forth the powers granted to a municipality that has chosen to adopt a home rule charter, explaining that it "may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter." 53 Pa.C.S. § 2961. *See also* Pa. Const., art. IX, § 2; Charter § 102 (incorporates this provision of the HRC & OPL). Therefore, a presumption exists that the exercise of power is valid if no restriction exists in the Constitution, the charter itself, or the acts of the Legislature. *Fraternal Order of Police, Fort Pitt Lodge No. 1 v. City of Pittsburgh,* 165 Pa.Cmwlth. 83, 644 A.2d 246, 249 (1994), *petition for allowance of appeal denied,* 544 Pa. 637, 675 A.2d 1253 (1996). However, regardless of this expanded autonomy, home rule municipalities must act according to the parameters set by the legisla-

and Managing Director also refused to recognize the hiring of Linda Kelleher to the position of Chief of Staff. (¶ 31.) City Council has not sought to fill the position of Legislative Coordinator while this controversy is ongoing. (¶¶ 31–32.)

5. Our standard of review in a declaratory judgment action is limited to determining

whether the trial court's findings are supported by substantial evidence, whether an error of law was committed or whether the trial court abused its discretion. *Allegheny County Detectives Association v. Allegheny County and The Allegheny County Retirement Board,* 804 A.2d 1285 (Pa.Cmwlth.2002).

ture in the HRC & OPL.[6] *County of Delaware v. Township of Middletown,* 511 Pa. 66, 511 A.2d 811 (1986).

■ In addition, this Court has held that general rules of statutory construction are applicable in interpreting provisions of a home rule charter. *Williams v. City of Pittsburgh,* 109 Pa.Cmwlth. 168, 531 A.2d 42, 44 (1987) (citing *Cottone v. Kulis,* 74 Pa.Cmwlth. 522, 460 A.2d 880 (1983)), *petition for allowance of appeal denied,* 518 Pa. 622, 541 A.2d 748 (1988). We must interpret statutes to ascertain and effectuate the intent of the legislature and, if possible, give effect to all of its provisions. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). Further, if the words of a statute are clear and unambiguous, a court may not ignore the letter of the law under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b); *Ramich v. Workers' Compensation Appeal Board (Schatz Electric, Inc.),* 564 Pa. 656, 770 A.2d 318 (2001). This Court must presume that the drafters of the charter did not intend a result which is absurd, impossible of execution or unreasonable. *Cottone,* 460 A.2d at 882.

### (I) *Merit Personnel System*

Appellants first contend that the Mayor and Managing Director alone possess administrative and executive authority over Reading's merit personnel system, which is mandated by the Charter. Defined in Section 702, the merit personnel system requires that personnel decisions for all non-exempt career service employees[7] be made solely on the basis of merit and qualifications. City Council agrees that, because neither the City Council Chief of Staff position nor the City Council Legislative Coordinator position is listed in the Charter as being exempt, both are considered non-exempt career service positions and are, thus, subject to the City's merit personnel system. (City Council Brief at 9.) Any appointment, promotion, transfer, demotion, suspension, dismissal or disciplinary action concerning any employee must be carried out in accordance with this system. The Charter mandates that, unless otherwise provided, the Mayor shall administer the City's merit personnel system for non-exempt career service personnel. (Charter § 308(m).) By implication, any decisions made by the Mayor relevant to employment of such personnel are to be made solely on the basis of merit and qualifications.

The Mayor carries out his responsibility for employment of personnel through the Managing Director, who is the chief administrative officer of the City. Section 406(b) states that the Managing Director shall "[d]irect and supervise the adminis-

---

**6.** Section 2962 delineates limitations on a municipality's powers; these are areas in which the legislature continues to exercise direct control of municipalities in the Commonwealth. 53 Pa.C.S. § 2962; *Fraternal Order of Police,* 644 A.2d at 249. None of the subsections of Section 2962 is applicable to this case.

**7.** Section 702 of the Charter states that elected officials, officers and employees must be classified as either exempt service or career service. Section 702(a) exempts only elected and certain appointed officials, and certain specifically delineated administrative employees, from the scope of the merit personnel

system: all elected officials; the Managing Director and the City Solicitor; the heads of departments, offices, and agencies immediately under the direction and supervision of the Managing Director; one clerk or secretary for each of the full-time elected City officials and the heads of each City department; the City Clerk; the members of authorities, boards, and commissions; and, temporary, part-time, or seasonal employees. Section 702(b) states that "[a]ll other officers and employees shall be members of the career service." Employees in the career service are non-exempt and subject to the merit personnel system.

tration of all departments, offices, and agencies of the City, except as otherwise provided by this Charter or by law." Human Resources is one of six departments in the administrative service [8] of the City reporting to the Managing Director.[9] (Administrative Code § 8.01.) The Director of Human Resources is appointed by the Mayor and responsible to the Managing Director. (Charter § 705; Administrative Code § 8.48.) Section 8.47 of the Administrative Code states, in pertinent part, that the Department of Human Resources "shall be responsible for the administration of the City personnel system" of which the merit personnel system is a part. *See* Charter § 705. Thus, while they may not be directly involved on a day-to-day basis, the Mayor and the Managing Director are ultimately responsible for carrying out the City's merit personnel system through appointment and supervisory responsibilities.

City Council argues, to the contrary, that it, nonetheless, has the authority to hire and fire these new employees. First, City Council asserts that the Court's decision in *League of Women Voters of Greater Pittsburgh v. Allegheny County*, 819 A.2d 155 (Pa.Cmwlth.2003), is "extremely persuasive on this issue" and, under that holding, City Council would have hiring and firing authority because the new employees will work in confidential positions only for City Council, whose members are elected. (City Council Brief at 15.)

■ In *League of Women Voters*, certain elected county Officers in Allegheny County (the Register of Wills, the Prothonotary, the Sheriff, the Recorder of Deeds and the Coroner) argued that the merit personnel system, which was prepared and administered by the county manager pursuant to the county charter, did not apply to them, and this Court agreed. However, although the facts in the case *sub judice* appear to be somewhat similar, the legal basis for our holding in the *League of Women Voters* case does not apply here. The positions of the elected officers in *League of Women Voters*, (colloquially known as "Row Offices"), "are units of local government created pursuant to section 401 of the Second Class County Code; [10] thus, the county offices are created pursuant to Commonwealth law." *Id.* at 157. Neither the officers nor the offices were specifically mentioned in the Allegheny County charter. *Id.* In the case *sub judice*, however, the Reading City Council is not created by state law, but by the Charter itself, which specifically establishes and defines its authority, creates the non-exempt employee category and defines the merit personnel system. Unlike in *League of Women Voters*, where the Allegheny County charter did not give the manager supervisory authority over "units of local government" created by state law, here the Charter explicitly provides that *all* positions in the *non-exempt career service* are subject to the City's merit personnel system pursuant to Charter § 702. Therefore, the analysis in *League of Women Voters* does not apply.[11]

---

8. Section 1.02B of the Administrative Code, entitled "Definitions," defines "Administrative Service" to mean "all personnel in those units of the City which are under the authority of the Managing Director."

9. The other departments in the administrative service reporting to the Managing Director are the Departments of Finance, Public Works, Community Development, Police and Fire. (Administrative Code § 8.01.)

10. Act of July 28, 1953, P.L. 723, *as amended*, 16 P.S. § 3401.

11. In addition, the clerks of court and prothonotaries in *League of Women Voters* are personnel of the unified judicial system, and thus are subject to a separation of powers analysis. 819 A.2d at 158 n. 12. *See also* footnote 16 *infra*.

Next, City Council argues that Section 209, subsections (d) and (e), allows it to control its own employees because "these sections were drafted with the intention that City Council be free from interference by the Executive branch when dealing with and making personnel decisions about City Council employees." (City Council Brief at 12.) Section 209 is entitled "Prohibitions," and reads as follows:

\* \* \*

(d) Except for the purpose of inquiry, the Council and its Members shall deal with the [sic] all departmental and bureau employees through the Mayor or the Managing Director.

(e) Neither the Council nor any of its Members shall in any manner dictate the appointment or removal of any City administrative offices or employees whom the Mayor or subordinates of the Mayor are empowered to appoint except as otherwise provided in this Charter.

City Council interprets these two provisions, which explicitly *limit* its authority to deal with non-exempt career service personnel, to be grants of authority allowing *it* to hire and fire non-exempt career service personnel working with City Council. However, Subsections 209(d) and (e) do not address City Council's authority to hire and fire such personnel.

In addition, City Council's argument concerning Sections 1.02B and 10.05 of the Administrative Code [12] also fails. It claims that these two sections bar City Council from "interfering" only with employees who report to the Administrative/Executive branch; therefore, City Council is free to deal with its own Legislative employees without interference. (City Council Brief at 13.) However, City Council cannot find affirmative authority by negative implication where City Council is not given this authority anywhere in the Charter, Administrative Code or Personnel Code. In fact, as made evident by Section 225 of the Charter, and its explicit grant of authority to City Council to appoint and "deal with" its own City Clerk, neither the Charter nor the associated Codes provide similar authority to City Council *for any other position.* Rather, that responsibility is assigned solely to the Mayor and Managing Director pursuant to Sections 308(m) and 406(b) of the Charter, as discussed previously.

Finally, City Council refers to Section 406, entitled "Powers and Duties." Subsection (c) states that the Managing Director shall "[a]ppoint, suspend, or remove any City employee, except as otherwise provided by this Charter or by law." City Council asserts that this subsection does not prevent it from making personnel decisions regarding employees not in the administrative service. This argument also fails for two reasons. First, the two positions at issue *are* categorized as non-exempt career service under the employment authority of the Managing Director. Therefore, the Managing Director's suspension and removal powers as described in Section 406(c) *would* apply to these two positions. Second, City Council has no authority to make personnel decisions regarding employees not in the administra-

12. As mentioned previously, subsection B of Section 1.02 of the Administrative Code, entitled "Definitions," defines "Administrative Service" to mean "all personnel in those units of the City which are under the authority of the Managing Director." Section 10.05, entitled "Interference of Administration," states: "Except as otherwise provided in this Admin-istrative Code, and for the purpose of inquiries and investigations, the Council or its members shall deal with employees in the administrative service solely through the Managing Director, and neither the Council nor its members shall give orders to such employees either publicly or privately."

tive service other than the City Clerk, described in Section 225 of the Charter.

In summary, City Council's arguments are based on interpretations of case law, and sections of the Charter and Administrative Code with which we do not agree, and, so, they do not support its position on this first issue.

### (II) Employment Authority of City Council

Appellant's next issue concerns Section 225 of the Charter which states that:

Within thirty (30) days of taking office, City Council shall appoint an officer of the City who shall have the title of City Clerk. .... The term of City Clerk shall be two (2) years with option to be re-appointed for successive terms. The City Clerk shall serve at the pleasure of Council.

Appellants argue, therefore, that the Charter authorizes the City Council to appoint ONLY the City Clerk. City Council claims, however, that Appellants' reliance on this Section is misplaced because the Section sets forth City Council's *appointment* powers only over an *exempt service* position, not the non-exempt career service positions at issue and, thus, can be distinguished.

Pennsylvania has long recognized the interpretive doctrine of *expressio unius est exclusio alterius,* which means the inclu-

sion of a specific matter in a statute implies the exclusion of other matters. *Pane v. Department of Highways,* 422 Pa. 489, 495, 222 A.2d 913, 916 (1966) (citing *Cali v. City of Philadelphia,* 406 Pa. 290, 305, 177 A.2d 824, 832 (1962)). The Charter assigns City Council hiring or appointing authority only in Section 225, and this Section specifically refers only to appointing a City Clerk. The absence of any references to other hiring authority implies that there is no additional hiring authority on the part of City Council.[13] Furthermore, the City Clerk, over whom City Council enjoys appointment and removal power, does not belong to the career service of the City of Reading. In other words, nothing in the Charter, the Administrative Code, or the Personnel Code vests in City Council *any* power over the *employment* of any non-exempt career service employees, which would include the two newly created positions of City Council Chief of Staff and Legislative Coordinator.

### (III) Employment Authority of Mayor and Managing Director

Next, Appellants argue that the employment authority of the Mayor and Managing Director is *not* confined to just the "Administrative Service" or "Administrative Branch." City Council, on the other hand, claims that Appellants' authority un-

---

**13.** City Council cites to Sections 207, 208 and 211 of the Charter to support its argument on this issue. All three sections are part of Article II of the Charter, entitled "Council—The Legislative Branch." However, none of these sections explicitly or implicitly provide City Council employment authority over non-exempt career service personnel, which is the crux of the issue in the case. Section 207 concerns its ability to fill vacancies on the *Council.* Section 208 concerns City Council's "General Powers and Duties." It states in pertinent part that, "[a]ll powers of the City not otherwise provided for in this Charter

shall be exercised in a manner to be determined by Council." Contrary to City Council's argument, this section does not give it the authority it seeks because *other sections of the Charter provide* the Mayor and Managing Director with *this authority, i.e.,* Sections 308(m) and 406(b) and (c). Section 211 concerns City Council's *removal powers* which are applicable only to the City Solicitor, persons appointed to their office by City Council, or elected officials and appointed Department Heads—all of which are *exempt* personnel pursuant to Charter § 702(a).

der the merit personnel system is *limited* to Executive Branch employees only, citing to case law and various sections of the Charter and Administrative Code.

There is no limiting provision in Section 308(m) of the Charter that confines the reach of the Mayor's **employment** authority to the administrative branch of the city government, as claimed by City Council. Rather, Section 308(m) gives the Mayor authority to employ **all** personnel necessary for the operation of the city government, including non-exempt career service City Council employees other than the City Clerk. Further, Section 406(c) states that the Managing Director, who reports to the Mayor, has authority over *all City employees*; this authority arises from the Managing Director's supervision of the Department of Human Resources. Pursuant to Sections 705 of the Charter and 8.47 of the Administrative Code, the Director of Human Resources administers the personnel system for the City, including the "recruiting, recommending, **hiring,** assignment, reassignment, bidding, training, performance evaluation, discipline and discharge *of all employees.*" (Administrative Code § 8.47.) (Emphasis added.) Thus, the Mayor and Managing Director have personnel responsibilities for all non-exempt career service employees in the City's government.

However, City Council notes that, pursuant to Section 105(c) of the Charter, "titles shall be used to explain and understand the purposes of any given Chapter or Section." City Council then cites to Sections 301 and 309 [14] of the Charter to support its argument that Appellants' authority under the merit personnel system is *limited* to Executive Branch employees only. City Council correctly notes that the Mayor controls, and is accountable for, the executive branch of the City government, and his appointment powers are limited to one City Solicitor, and members of boards, authorities and commissions. (Charter §§ 301, 309.) *See also* Administrative Code, art. III. City Council also correctly states that the Managing Director is the chief administrative officer of the City responsible to the Mayor for the administration of all City affairs. (Charter § 406.) *See also* Administrative Code, art. IV. From these sections, *inter alia,* City Council concludes that "it is clearly indicated by the Charter that the Mayor's employment power (as well as other powers) is limited to the Executive branch and that his appointment powers are limited to the positions quoted above." (Appellee's Brief at 11.) Furthermore, since the City Council's Chief of Staff and Legislative Coordinator positions are within the non-exempt career service, but *not* in the Executive branch, City Council argues it has the authority to hire and fire for these positions.

We do not agree with City Council's arguments. While the Charter sections City Council cites show it to be a separate branch of Reading's city government that does not report to either the Mayor or Managing Director, they do not, in any way, limit the Mayor's and/or Managing Director's **employment authority** only to the administrative service or executive branch. Rather, Section 702 of the Char-

**14.** As previously mentioned, Article II of the Charter is entitled "Council—The Legislative Branch." Both of the sections mentioned in *this footnote are in Article III of the Charter,* entitled "Executive Branch." Section 301, entitled "The Mayor," states that "[t]he executive, administrative, and law enforcement powers of the City shall be vested in the Mayor. The Mayor shall control and be accountable for the executive branch of City government, as provided by this Charter." Section 309, entitled "Appointment by the Mayor," states, in pertinent part, that "[t]he Mayor shall appoint: (a) One City Solicitor ... [and] (b) All members of Boards, Authorities and Commissions...."

ter defines all persons who are non-exempt career service employees and, as previously discussed, under Charter Sections 308(m) and 406(c), the Mayor and Managing Director have employment authority over all such employees. Further, relevant to these two sections and contrary to City Council's argument, nothing in the phrases "unless otherwise provided" (in Section 308(m)) or "except as otherwise provided" (in Section 406(c)), gives **employment authority** to City Council, except as pertains to the City Clerk, because the Charter has not provided otherwise for employees of City Council. *See* Charter § 225.

### (IV) *Separation of Powers in Local Government in Pennsylvania*

Given that the Charter does not provide for City Council to hire the individuals to fill these positions, we must determine whether the constitutional separation of powers doctrine applies in this situation and would, nonetheless, require that these positions fall within City Council's purview, as determined by common pleas.

■ It is axiomatic that a municipality that governs by home rule charter cannot exercise any power that is denied by the Constitution. *Appointment of District Attorney*, 756 A.2d 711 (Pa.Cmwlth.2000); Pennsylvania Constitution of 1968, Art. IX, § 2. The narrow issue presented here is whether the Constitutional doctrine of sep-

aration of powers is specifically applicable to local government entities in Pennsylvania. This question has not yet been answered by our state courts.[15]

■ The Pennsylvania Constitution establishes that each branch at the *state* level, the legislative, executive and judiciary, possesses the power to control the employees within its branch. *See, e.g.,* Art. III, § 17, Appointment of Legislative Officers and Employees ("The General Assembly shall prescribe by law the number, duties and compensation of the officers and employees of each House, . . . ."); Art. IV, § 2, The Executive ("The supreme executive power shall be vested in the Governor . . . ."); Art. V, § 10, Judicial Administration ("The Supreme Court shall exercise general supervisory and administration authority over all the courts . . . ."). However, the Constitution does not articulate a requirement that *local,* municipal governments have a separation of powers. In fact, it specifically provides that the electors can determine for themselves what form of local government they wish, *see* Article IX. Importantly, many of the permissible forms of local government in Pennsylvania do not, in fact, separate the legislative and executive functions. (*See, e.g.* The First Class Township Code, Act of June 24, 1931, P.L. 1206, *as amended,* 53 P.S. §§ 55101–58502; The Borough Code, Act of February 1, 1966, P.L. (1965) 1656, *as amended,* 53 P.S. §§ 45101–48501). In

---

**15.** The judicial branch of the state government is established in Article V of the Pennsylvania Constitution; Section 10 of that Article sets forth the Pennsylvania Supreme Court's supervisory authority over Pennsylvania courts. Thus, any discussion of the separation of powers involving the judiciary, involves a different constitutional question. *See, e.g., League of Women Voters,* 819 A.2d at 158 n. 12 ("If we were to interpret the Charter to allow the Executive branch of the County's government to prepare and administer the personnel system for personnel of the

Judicial branch of government, we would be construing the Charter in a manner that violates the constitutional separation of powers."). *See also Commonwealth v. Mockaitis,* —— Pa. ——, 834 A.2d 488 (2003) ("The General Assembly cannot constitutionally impose upon the judicial branch powers and obligations exclusively reserved to the legislative or executive branch . . . ."); *Commonwealth v. Sutley,* 474 Pa. 256, 262, 378 A.2d 780, 783 (1977) ("[A]ny encroachment upon the judicial power by the legislature is offensive to the fundamental scheme of our government.")

fact, the City of Reading, before adopting the Charter, had a Commission form of government in which the executive and legislative functions were combined in the City Council.

■■■ The requirement of a separation of powers in local government exists only if dictated by the state constitution, or if set forth in its charter.[16] As one court has phrased it, "there is no natural law of the separation of powers, and the powers of local government are separate only insofar as the State Constitution makes them." *Jordan v. Smith,* 669 So.2d 752, 756 (Miss. 1996). Among the rationales expressed for this viewpoint are (1) that the purpose of the separation of powers doctrine is to provide a system of checks and balances for the three branches of government, and such a system is not needed at the local level because local government is kept in check by the various departments of state government, and (2) that official functions of local governments frequently overlap and, if the doctrine of separation of powers

applied to local governments, the cost of government at the local level might become overly burdensome. *Ball v. Fitzpatrick,* 602 So.2d 873, 878 (Miss.1992) (Banks, J. concurring). In fact, were there an inherent, natural constitutional doctrine of separation of powers at the local level, many forms of local government in which the legislative and executive functions are merged, *such as the commission form of government in existence in Reading prior to enactment of the Charter,* and those in existence in many other Pennsylvania municipalities, would be unconstitutional.

■■■ We are persuaded by the rationales expressed above and hold that, in Pennsylvania, because the State Constitution does not dictate the separation of powers at the local government level, there is no Constitutional separation of powers at the local government level. This conclusion is consistent with the conclusions of other jurisdictions.[17] Accordingly, al-

---

16. States are free to arrange the disposition of their powers as they wish as long as they do not violate the federal constitution. 25 Stetson L.Rev. 627, 662 (1996). This extends to a state's choice as to how the powers of local government are to be arranged. *Id.* Actually, there exists no constitutional obligation to provide local government. *See Hunter v. City of Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907).

17. *Ball v. Fitzpatrick,* 602 So.2d 873, 878 (Miss.1992) (the "system of checks and balances is not needed at the local level") (citing *State, ex rel. Wilkinson v. Lane,* 181 Ala. 646, 62 So. 31, 34 (1913) ("doctrine of separation of powers has 'no applicability, and [was] never intended to apply, to mere town or city governments or to mere town or city officials' "); *Ghent v. Zoning Commission,* 220 Conn. 584, 600 A.2d 1010, 1012 (1991) ("The constitutional provision [of separation of powers] applies to the state and not to municipalities, which are governed by charters and other statutes enacted by the legislature."); *Poynter v. Walling,* 177 A.2d 641, 645

(Del.Super.Ct.1962) ("constitutional requirement of separation of powers of the three governmental departments applies to state government and not to the government of municipal corporations and their officers"); *Tendler v. Thompson,* 256 Ga. 633, 352 S.E.2d 388, 388 (1987) ("doctrine of separation of powers applies only to the state and not to municipalities or to county governments"); *Willsey v. Newlon,* 161 Ind.App. 332, 316 N.E.2d 390, 391 (1974) ("it has repeatedly been held that the separation of powers doctrine of Article III has no application at the local level"); *Bryan v. Voss,* 143 Ky. 422, 136 S.W. 884, 887 (1911) ("it has not been the policy of the state to separate legislative from executive functions in its government of the municipalities"); *Wilson v. City of New Orleans,* 466 So.2d 726, 729 (La. Ct.App.1985) ("doctrine applies only to the state and is not applicable to local governments"); *County Council for Montgomery County v. Investors Funding Corporation,* 270 Md. 403, 312 A.2d 225, 243 (1973) ("constitutional doctrine of separation of powers is ... not applicable to local government"); *State,*

though the Charter may deviate from the customary practice of providing supervisors with authority to hire and fire employees they supervise, the enabling legislation (HRC & OPL) provides the City with the authority to do so, *see Goldsmith v. City Council of the City of Easton,* 817 A.2d 565 (Pa.Cmwlth.2003), and such authority is not constitutionally infirm under a separation of powers theory.

For the reasons outlined in this opinion, we reverse, in part, the order of the trial court.

*ex rel. Simpson v. City of Mankato,* 117 Minn. 458, 136 N.W. 264, 267 (1912) (separation of powers "does not apply to municipal governments"); *Graziano v. Mayor and Township Committee,* 162 N.J.Super. 552, 394 A.2d 103, 108 (1978) ("the separation of powers doctrine as it applies to federal and state governments is inapplicable to municipalities"); *Board of County Commissioners v. Padilla,* 111 N.M. 278, 804 P.2d 1097, 1102 (N.M.Ct. App.1990) ("[t]raditional doctrine derives from concern about the tyranny that can arise when one branch of government—the executive, legislative, or judicial—assumes

## ORDER

**NOW,** November 17, 2003, the order of the Court of Common Pleas of Berks County in the above-captioned matter is hereby reversed, in part, in accordance with the foregoing opinion.

the powers of another. Apparently, because this danger is diminished for a level of government whose powers are subordinated to higher levels of government or otherwise limited, the New Mexico Constitution's provision on separation of powers ... does not apply to the distribution of power within local governments."); *LaGuardia v. Smith,* 288 N.Y. 1, 41 N.E.2d 153, 156 (1942) ("theory of co-ordinate, independent branches of government has been held generally to apply to the national system and to the states, but not to the government of cities.")).