IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Conference of Presidents of Major : \
Italian American Organizations, Inc., : \
Philadelphia City Councilmember Mark F. : \
Squilla, The 1492 Society, Jody Della Barba, : \
and Grand Lodge of Pennsylvania Sons and : \
Daughters of Italy, : \
      Appellants : \
           : \
    v.      :   No. 516 C.D. 2023 \
           : \
City of Philadelphia and :   Argued: March 5, 2025 \
Mayor James F. Kenney : \

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, President Judge \
      HONORABLE PATRICIA A. McCULLOUGH, Judge \
      HONORABLE ANNE E. COVEY, Judge \
      HONORABLE MICHAEL H. WOJCIK, Judge \
      HONORABLE CHRISTINE FIZZANO CANNON, Judge \
      HONORABLE STACY WALLACE, Judge \
      HONORABLE MATTHEW S. WOLF, Judge

OPINION \
BY JUDGE McCULLOUGH       FILED: August 6, 2025

    The Conference of Presidents of Major Italian American Organizations, Inc. (COPOMIAO), Philadelphia City Councilmember Mark F. Squilla (Councilmember Squilla), The 1492 Society, Jody Della Barba, and Grand Lodge of Pennsylvania Sons and Daughters of Italy (together, Appellants), appeal from the May 2, 2023 order of the Court of Common Pleas of Philadelphia County (trial court), which sustained the preliminary objections of the City of Philadelphia (City) and Mayor James F. Kenney (Mayor or Mayor Kenney) (together, Appellees) and dismissed Appellants' 30-count complaint (Complaint) with prejudice. In the Complaint, Appellants assert six substantive claims challenging an executive order issued by

Mayor Kenney which, among other things, eliminated the Columbus Day holiday in the City and replaced it with Indigenous Peoples' Day (Executive Order 2-21).

In this Court, Appellants seek reversal of the trial court's order and reinstatement of the Complaint.

After thorough review, we reverse and remand for further proceedings.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Because we are reviewing an order that sustained preliminary objections, we first summarize the material allegations of Appellants' Complaint, as follows.

Executive Order 2-21, issued on January 27, 2021,  provides, in pertinent part, as follows:

**EXECUTIVE ORDER NO. 2-21**

**DESIGNATING JUNETEENTH AS AN OFFICIAL CITY HOLIDAY AND RENAMING THE HOLIDAY FORMERLY KNOWN AS COLUMBUS DAY TO INDIGENOUS PEOPLES' DAY**

WHEREAS, the City of Philadelphia holds an integral place in our nation's founding as the birthplace of democracy, the Constitution, and the Declaration of Independence, where the following words were written: "that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness";

WHEREAS, despite these words, the United States continued to be stained by the institution of slavery and racism;

. . . .

WHEREAS, on June 19, 2019, Governor Tom Wolf designated June 19th as Juneteenth National Freedom Day in Pennsylvania.[1]

. . . .

WHEREAS, the need to acknowledge institutional and structural racism is needed now more than ever;

WHEREAS, the City of Philadelphia is committed to work for true equity for all Philadelphia residents, and toward healing our communities;

WHEREAS, the story of Christopher Columbus is deeply complicated. For centuries, he has been venerated with stories of his traversing the Atlantic and "discovering" the "New World[."] The true history of his conduct is, in fact, infamous. Mistakenly believing he had found a new route to India, Columbus enslaved indigenous people, and punished individuals who failed to meet his expected service through violence and, in some cases, murder;

WHEREAS, over the last 40 years many states and cities have acknowledged this history by recognizing the holiday known as Columbus Day instead as Indigenous Peoples' Day. These jurisdictions include: Arizona, Michigan, Minnesota, North Carolina, Vermont, Virginia, Wisconsin and Washington, D.C.;

. . . .

NOW, THEREFORE, I, MAYOR JAMES F. KENNEY, Mayor of the City of Philadelphia, by the powers vested in me by the Philadelphia Home Rule Charter, do hereby ORDER as follows:

**SECTION 1. DESIGNATION OF JUNETEENTH AS A CITY HOLIDAY**

June 19th of every year is designated a holiday for all City employees and shall be treated as such in accordance with

---

[1] More accurately, the General Assembly designated June 19th as Juneteenth National Freedom Day by the Act of June 19, 2019, P.L. 34, 44 P.S. § 40.12, colloquially known as Act 9. Governor Wolf signed Act 9 into law on June 19, 2019.

3

the applicable Civil Service regulations and Administrative Board [r]ules.

**SECTION 2. RENAMING OF HOLIDAY**

The City holiday celebrated on the second Monday in October, formerly known as Columbus Day, shall now be designated as Indigenous Peoples' Day.

**SECTION 3. DIRECTIVE TO CITY OFFICIALS**

The Director of Finance, Chief Administrative Officer and Deputy Mayor for Labor are directed to make appropriate notifications to effectuate this Order.

(Reproduced Record (R.R.) 000071a.)[2]

On April 4, 2021, Appellants filed an action (Federal Action) against the City and Mayor Kenney in the United States District Court for the Western District of Pennsylvania (District Court), in which they alleged that Executive Order 2-21 violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution,[3] the Philadelphia Home Rule Charter (Charter),[4] the separation of powers doctrine, the Sunshine Act,[5] and the First Class City Home Rule Act (Home Rule Act).[6] *Conference of Presidents of Major Italian American Organizations, Inc. v. City of Philadelphia* (U.S. Dist., W.D. Pa., Civil Action No. 21-1609, filed January 12, 2022),

---

[2] Executive Order 2-21 also includes several historical observations and City policy statements regarding African-American history and the significance of the Juneteenth holiday.

[3] U.S. Const. amend. XIV ("[no] State [shall] deny to any person within its jurisdiction the equal protection of the laws").

[4] City of Philadelphia, Pennsylvania, Home Rule Charter (1952), *as amended*, *available at* https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-262986 (last visited August 5, 2025).

[5] 65 Pa.C.S. §§ 701-716.

[6] Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101-13157.

2022 WL 118118, at *1. Appellants also sought, among other relief, a declaration that Italian Americans are a protected class. *Id.*

The City and Mayor Kenney filed motions to dismiss, which the District Court granted. The District Court concluded that Appellants lacked standing to bring their Equal Protection claims because they failed to allege any actionable discriminatory treatment or particularized injury. *Id.* at *4-*7. The District Court further concluded that, even assuming Appellants had standing, their Equal Protection claims failed in any event because (1) Executive Order 2-21 is protected government speech, and (2) Appellants failed to allege any particularized discriminatory treatment or discriminatory intent. *Id.* at *8-*9. Having dismissed all of Appellants' federal claims, the District Court declined to exercise pendant jurisdiction over the state law claims and dismissed them without prejudice. *Id.* at *10. The Third Circuit Court of Appeals (Third Circuit) affirmed, concluding that Appellants lacked standing to bring their federal claims because they "failed to plead an injury-in-fact" or, in other words, "an invasion of a legally protected interest." *Conference of Presidents of Major Italian American Organizations, Inc. v. City of Philadelphia* (U.S. Cir., 3d Cir. Ct. App., No. 22-1116, filed January 27, 2023), 2023 WL 1069704, at *2-*3.

While the Federal Action was on appeal to the Third Circuit, Appellants filed the Complaint in this matter on April 14, 2022. In it, Appellants summarize the history of Columbus Day, Indigenous People, Councilmember Squilla's initiative to investigate Christopher Columbus, and what Appellants allege has been Mayor Kenney's long history of discriminatory comments and conduct against Italian Americans in the City. (R.R. 000013a-33a.) Appellants allege that they have been directly aggrieved by Mayor Kenney's actions, chiefly in the issuance of Executive Order 2-21. They assert six substantive claims against Appellees challenging the

validity of Executive Order 2-21 and requesting that the trial court declare it void and enjoin its enforcement. Specifically, Appellants (1) allege that Executive Order 2-21 violates their equal protection rights under article I, section 29 of the Pennsylvania Constitution (Counts I-V),[7] (2) request a declaratory judgment declaring that Italian Americans are a protected class under the Pennsylvania Constitution (Counts VI-X), (3) request a declaratory judgment declaring that Executive Order 2-21 is unconstitutional as violative of the equal protection guarantees of the Pennsylvania Constitution (Counts XI-XV), (4) allege that Executive Order 2-21 violates Sections 7-400 and 4-300 of the Charter[8] (Counts XVI-XX), (5) request a declaratory judgment declaring that Executive Order 2-21 violates the separation of powers principles set forth in article IX, section 2 of the Pennsylvania Constitution,[9] Section 1-101 of the Charter,[10] and Section 6(a)(III) of the First Class City Government Law[11] (Counts XXI-

---

[7] Pa. Const. art. I, § 29 ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual."). Notably, although Appellants mention article I, section 26 of the Pennsylvania Constitution, it does not form the basis of their equal protection claims.

[8] Charter, §§ 7-400, 4-300.

[9] Pa. Const. art. IX, § 2 (home rule municipalities may "exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time").

[10] Charter, art. I, § 1-101 ("The legislative power of the City . . . shall be exclusively vested in and exercised by a Council, subject only to the provisions of [the] [C]harter.").

[11] Act of June 26, 1919, P.L. 581, *as amended*, 53 P.S. § 12127(a)(III) ("It shall be the duty of the mayor: . . . [t]o recommend, by message in writing to the council, all such measures connected with the affairs of the [C]ity and the protection and improvement of its government and finances as he shall deem expedient.").

XXV), and (6) allege that Executive Order 2-21 violates multiple provisions of the Home Rule Act (Counts XXVI-XXX).

Appellees filed preliminary objections to the Complaint on May 11, 2022, in which they (1) objected to all counts of the Complaint based on the pendency of the Federal Action (*lis pendens*), which at the time was on appeal to the Third Circuit (Pa.R.Civ.P. 1028(a)(6)); (2) objected to Counts I-XV on the ground that equal protection challenges to Executive Order 2-21 were barred by *res judicata* and/or collateral estoppel (Pa.R.Civ.P. 1028(a)(4); (3) objected to the entirety of the Complaint based on Appellants' lack of standing; and (4) demurred to all Counts alleging their failure to state a claim on which relief could be granted (Pa.R.Civ.P. 1028(a)(4)).[12]

The trial court sustained the preliminary objections by order entered November 10, 2022, on the ground that the Complaint "raises the same claims between substantially the same parties and seeks the same relief as the prior Federal [A]ction currently on appeal." (R.R. 000721a.) After temporarily granting reconsideration, the trial court on May 2, 2023, again sustained the preliminary objections and dismissed the Complaint with prejudice "on the basis of, among other things, claim preclusion, issue preclusion, and legal insufficiency." (R.R. 000877a.)

Appellants appealed to this Court on May 17, 2023, after which the trial court directed that they file a Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statement within 21 days. Appellants complied on June 8, 2021, challenging the trial court's rulings on *res judicata*, standing, *lis pendens*, and legal sufficiency. (R.R. 000891a-92a.) In its supporting opinion, the trial court explained that (1) Counts I-XV of the Complaint properly were dismissed as barred by *res judicata* because they

---

[12] Appellants withdrew Counts XVI-XX of the Complaint after Appellees filed their preliminary objections.

7

mirrored those claims raised and dismissed in the Federal Action (Trial Ct. Op. at 3-5) (unpaginated); (2) Counts XXI-XXV of the Complaint properly were dismissed as legally insufficient because Executive Order 2-21, as a matter of law, did not violate any provisions of the Charter, *Id.* at 5-7; and (3) Counts XXVI-XXX of the Complaint properly were dismissed because "[Appellants] failed to [cite] to any act of the General Assembly applicable in every part of the Commonwealth mandating that a City holiday go by a specific name." *Id.* at 8. The trial court did not discuss or rely on Appellants' alleged lack of standing in its opinion.

## II.     ISSUES ON APPEAL

Appellants present four issues for our review, namely, (1) whether the trial court erred in dismissing for legal insufficiency Appellants' claim that Executive Order 2-21 violated the Home Rule Act; (2) whether the trial court erred in dismissing for legal insufficiency Appellants' claim that Executive Order 2-21 violated the Charter; (3) whether the trial court erred in dismissing Appellants' equal protection claims based on *res judicata*, claim/issue preclusion, and/or collateral estoppel; and (4) whether the trial court erred in dismissing the Complaint on the ground that Appellants lack standing.

## III.     STANDARD AND SCOPE OF REVIEW

> Where a court of common pleas dismisses a complaint based on preliminary objections, this Court's review is limited to determining whether the trial court committed an error of law or an abuse of discretion. When considering preliminary objections, we must accept as true all well-pleaded material facts alleged in the complaint and all reasonable inferences deducible therefrom. A preliminary objection should be sustained only in cases when, based on the facts pleaded, it is clear and free from doubt that the facts pleaded are legally insufficient to establish a right to relief. Because a preliminary objection in the nature of a demurrer presents a

8

> question of law, this Court's standard of review of a court of common pleas' decision to sustain a demurrer is *de novo* and the scope of review is plenary.

*Minor v. Kraynak*, 155 A.3d 114, (Pa. Cmwlth. 2017) (internal citations, quotations, and editing omitted).

## IV.  DISCUSSION

### A.  Standing

We first address Appellants' last issue, that of standing, which goes to the justiciability of the substantive issues raised in this appeal. *Allegheny Reproductive Health Center v. Pennsylvania Department of Human Services*, 309 A.3d 808, 832 (Pa. 2024). Because standing is a question of law, our standard of review is *de novo* and our scope of review is plenary. *Office of the Governor v. Donahue*, 98 A.3d 1223, 1228 (Pa. 2014).

Although the parties have briefed the issue of standing, we nevertheless conclude that it is not properly before us in this appeal. Appellees challenged Appellants' standing in their preliminary objections. (R.R. 000193a.) However, the trial court did not expressly sustain Appellees' standing objection in the orders entered November 10, 2022, and May 5, 2023, and further did not address or rely on standing to support its order dismissing the Complaint with prejudice. Although it briefly mentioned standing in its supporting opinion in referencing the Federal Action, *see* Trial Ct. Op. at 4, the trial court did not perform any independent standing analysis under Pennsylvania law. Instead, in dismissing the Complaint based on *res judicata* and demurrers, it appears to have assumed Appellants' standing for purposes of its analysis. Accordingly, because standing did not form the basis of the trial court's ruling, does not implicate this Court's jurisdiction, and may not, as a result, be raised

9

*sua sponte*, we do not address it. *See Liberties Lofts LLC v. Zoning Board of Adjustment*, 182 A.3d 513, 523-24 (Pa. Cmwlth. 2018).[13]

## B. Violation of the Charter

We next address Appellants' second issue because it is dispositive. Appellants argue that the trial court erred in concluding that their separation of powers claims fail as a matter of law because the power to establish and change official City holidays is a legislative power that the Charter reserves exclusively to Council. Appellants argue that, as a matter of law, Executive Order 2-21 unlawfully usurps this power by eliminating Columbus Day and replacing it with Indigenous Peoples' Day with no involvement of Council. We agree and reverse.

### 1. Applicable Legal Principles and Charter Provisions

Article IX, section 2 of the Pennsylvania Constitution gives municipalities the right to adopt home rule charters and authorizes a home rule municipality to "exercise any power or perform any function not denied by this Constitution, by its home rule charter[,] or by the General Assembly at any time." Pa. Const. art. IX, § 2. *See also* Section 1 of the Home Rule Act, 53 P.S. § 13101 ("Any city of the first class

---

[13] In any event, the standing determination in the Federal Action was not controlling in the trial court and would not be controlling in this Court. Pennsylvania's standing doctrine is a judicially-created tool used to regulate litigation and assure that courts decide only justiciable cases and controversies. *Allegheny Reproductive Health Center*, 309 A.3d at 832. Standing in Pennsylvania courts is distinct from federal standing, which is based on Article III of the United States Constitution. *Id.* "[I]n contrast to the federal approach, notions of case or controversy and justiciability in Pennsylvania have no constitutional predicate [and] do not involve a court's jurisdiction[.]" *Id.* (citation omitted). Generally, then, "in our Commonwealth, standing is granted more liberally than in federal courts," and Pennsylvania courts "are not bound by the dictates of Article III of the United States Constitution." *Id.* (citation omitted). Thus, even if the question of standing were before us, we would analyze it under Pennsylvania's broader, more permissive standing principles, which require only that a party have a "substantial, direct and immediate interest in the outcome of litigation." *McGuire on Behalf of Neidig v. City of Pittsburgh*, 250 A.3d 516, 527 (Pa. Cmwlth. 2021) (internal quotations and citation omitted).

may frame and adopt a charter for its own government and may amend its charter whether the same has been originally adopted under the provisions of this act or provided by local, special or general law.") (footnote omitted). The City enacted the Charter pursuant to the Home Rule Act, which similarly provides that a home rule first class city "shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions." *Id.*, § 13131. The City also "may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law." *Id.* These powers are limited only by the Charter itself, the United States and Pennsylvania Constitutions, and the enactments of the General Assembly. *Id.*; *Crawford v. Commonwealth*, 326 A.3d 850, 859 (Pa. 2024) (citing *City of Philadelphia v. Schweiker*, 858 A.2d 75, 84 (Pa. 2004)).

When interpreting a home rule charter, as we must do here, we apply statutory construction principles. *City Council, City of Reading v. Eppihimer*, 835 A.2d 883, 887 (Pa. Cmwlth. 2003). As with statutes, we interpret a home rule charter to ascertain and effectuate the legislative intent behind it and to give effect to all of its provisions. *Id.* (citation omitted); Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a). If the words of the charter are clear, we follow and do not disregard them in furtherance of what we might divine as the charter's spirit. *Eppihimer*, 835 A.2d at 887; 1 Pa.C.S. § 1921(b). We presume that the drafters of the charter did not intend results that are absurd, unreasonable, or impossible to execute. *Eppihimer*, 835 A.d at 887; 1 Pa.C.S. § 1922(1). Lastly, we interpret any one part of a charter with reference to its entirety and do not interpret provisions out of context. *Cottone v. Kulis*, 460 A.2d 880, 882 (Pa. Cmwlth. 1982) (citation omitted).

The following Charter provisions are pertinent here. Regarding the power to legislate, Section 1-100 of the Charter sets forth the general scope of the City's home rule powers and provides that it "shall have the power to enact ordinances and to make rules and regulations necessary and proper for carrying into execution its powers[.]" Charter, § 1-100. Section 1-101 of the Charter directs that the legislative power of the City, "including any such power which may hereafter be conferred on the City" by the Pennsylvania Constitution or General Assembly, "shall be exclusively vested in and exercised by a Council, subject only to the provisions of [the C]harter." *Id.*, § 1-101; *see also id.*, § 1-100, Annotation 3 ("Legislation in the home rule area is now within the exclusive province of the City Council.").

The executive and administrative power of the City is "exclusively vested in and exercised by [the] Mayor and such other officers, departments, boards[,] and commissions as are designated and authorized in [the C]harter." *Id.*, § 1-102(1). The Charter prescribes the various responsibilities of the Mayor, which include, *inter alia*, recommending in writing to Council "all such measures connected with the affairs of the City, the protection and the improvement of its government and finances, and the promotion of the welfare of its people as the Mayor shall deem desirable." *Id.* § 4-102; *see also* Section 6(a)(I), (III), (V) of the First Class City Government Law, 53 P.S. § 12127(a)(I), (III), (V) (setting forth similar duties of the Mayor). Section 1-102(2) of the Charter specifies that any new executive or administrative powers conferred on the City by the Pennsylvania Constitution or General Assembly "shall be vested in the Mayor and, as far as practicable, in the other "officers, departments, boards[,] and commissions designated in t[he] [C]harter." Charter, § 1-102(2). Council, by ordinance, must then "distribute among such officers, departments, boards and commissions such new powers and duties, but to the extent that this is not practicable,

12

[Council] may create additional offices, boards[,] and commissions for the exercise of such powers and the performance of such duties and provide for the appointment of new officers or members of new boards or commissions." *Id.*

Within its broader grant of executive and administrative powers, the Charter authorizes the promulgation of regulations to govern the terms and conditions of City civil service employment. Pertinent here, Section 7-400 directs that civil service regulations "pertaining to the position classification plan, pay plan, hours of work, *holidays*[,] and annual vacation and sick leave shall be submitted by the Personnel Director[14] for approval to the Civil Service Commission[15] and Administrative Board."[16] Charter, § 7-400 (emphasis added). Section 7-401 of the Charter prescribes the contents of the civil service regulations, which establish employment conditions such as position classifications, pay plans, fitness examinations, qualification, promotion, and performance criteria, hours of work,

---

[14] The Personnel Director is responsible for preparing, and administering the civil service program under, the civil service regulations. Charter, § 7-100. *See also id.*, Annotations 1, 2 (direct administration of the civil service system is performed by the Personnel Directors, which system is governed by civil service regulations prepared by the Personnel Director and reviewed and approved by the Civil Service Commission and Administrative Board).

[15] The Civil Service Commission is responsible for, *inter alia*, advising the Mayor and Personnel Director and approving, modifying, or disapproving proposed civil service regulations and regulation amendments. Charter, § 7-200. The Civil Service Commission also hears and decides employee appeals of employment decisions. *Id.*, § 7-201.

[16] The Administrative Board, also a part of the Executive and Administrative Branch, is responsible for, *inter alia*, approving or disapproving department, board, and commission internal government rules and civil service regulations dealing with the "position classification plan, pay plan, hours of work, *holidays*, and vacation and sick leave." Charter, § 4-300(1)(a), (b) (emphasis added); *See also id.*, § 4-300(2)(a) (the Administrative Board shall determine from time to time "the hours when offices of the City government shall open and close"); *id.*, Section 4-300, Annotation 15 ("Thus, while the shaping and development of broad City governmental policies remain a function of the Mayor and his Cabinet, the responsibility for controlling and regulating the many administrative details of City government is vested in a small compact [Administrative] Board . . . .").

holidays, attendance, leaves of absence, and other similar matters. *Id.* § 7-401(a)-(w). Regarding holidays specifically, the Charter notes that "[e]mployees are entitled to know when they are required to work, their holidays, and other attendance regulations." *Id.* § 7-401(r), Annotation.

## 2. Parties' Arguments and Analysis

The trial court concluded that Counts XXI-XXV of the Complaint fail as a matter of law because Appellants "failed to plead that [Appellees] exerted a power the [ ] Charter granted to [City Council] and not the [Mayor]." (Trial Ct. Op. at 6.) More specifically, the trial court concluded that Section 7-400 of the Charter delegates the regulation of City holidays to the City Personnel Director, who is a "member of the Executive and Administrative Branch." *Id.* Because the Personnel Director submitted to the Civil Service Commission and Administrative Board a proposed regulation replacing Columbus Day with Indigenous Peoples' Day pursuant to Section 7-400,[17] the trial court concluded that Appellants failed to plead how any legislative power of Council was wrongfully usurped by Mayor Kenney's office. *Id.* at 7.

Appellants argue that the trial court erred in this respect because the establishment of City holidays is a legislative power reserved exclusively to Council that it historically has exercised. For example, Appellants allege in the Complaint that Council has, by resolution, designated a week in October as Italian American Heritage Week, which celebrates and commemorates Columbus's voyage to the New World.

---

[17] Despite this, Civil Service Regulation 19.01, which specifies the "Recognized Holidays" for City civil service employees, includes "Columbus/Indigenous Peoples' Day" as a recognized holiday. *See* Civil Service Regulation 19.01, *available at* https://www.phila.gov/publications/civil-service-regulations/#/page/19.?subsection=19.01 (last visited August 5, 2025). Council does not include Columbus Day in its list of 2025 holidays when Council offices are closed. *See* https://phlcouncil.com/holidays/ (last visited August 5, 2025).

14

(Appellants' Br. at 18-19; R.R. 000053a.)[18]  Appellants contend that, because Executive Order 2-21 both eliminates a City holiday and replaces it with a new one, all without any recommendation to or participation by City Council, it usurps a legislative power of Council and, therein, violates the Charter.  (Appellants' Br. at 18-19.)

Appellees argue in response that Appellants have not identified in their Complaint any provisions of the Charter that give Council *exclusive* authority to designate City holidays.  Instead, Appellees argue that only Section 7-400 of the Charter deals with City holidays and directs that the Personnel Director prepare and submit regulations regarding holidays to the Civil Service Commission and Administrative Board for approval.  (Appellees' Br. at 15.)  Because the Personnel Director is part of the City's Executive and Administrative Branch, Appellees argue that the Charter does not vest in Council exclusive authority to establish City holidays. *Id.*  Rather, Appellees argue that holiday designations essentially are ceremonial acts within the scope of the Mayor's powers, and Executive Order 2-21 therefore does not run afoul of the Charter's separation of powers principles.

As the parties concede, the Charter does not specifically designate to any branch or office of City government the authority to establish, recognize, eliminate, or change official City holidays.  Although it is undisputed that the Personnel Director may, and here did, recommend for approval regulations to implement Executive Order 2-21's directives for City civil service employees, neither the Personnel Director, nor the Civil Service Commission, nor the Administrative Board has the authority under

---

[18] Council Resolution No. 170872, which was co-sponsored by Councilmember Squilla, designated the week of Monday, October 2, through Monday, October 9, 2017, as "Italian American Heritage Week" in the City.  The resolution commemorated Columbus's voyage to the New World and honored Connie Francis as Grand Marshall of the 2017 Columbus Day Parade.  (R.R. 000542a-43a, 000545a.)

15

the Charter to *establish*, *eliminate*, or *change* officially recognized City holidays. That authority extends well beyond the regulatory power of these non-elected administrative offices.

Moreover, and more obviously, Executive Order 2-21 is not a civil service regulation and was not "recommended" by the Personnel Director. Instead, it is a broad order issued by Mayor Kenney that recites and recognizes over a dozen social and political policies, establishes and changes City holidays, and orders the Director of Finance, the Chief Administrative Officer, and the Deputy Mayor for Labor to effectuate its terms. (R.R. 000071a.) It does not "recommend" anything or request approval from any other City department or from Council. We therefore cannot agree with the suggestion of Appellees and the trial court that the Charter's delegation to the Personnel Director of certain limited administrative and regulatory powers over City employee holidays necessarily transfers to the Mayor's office the prerogative to set the City's social and political policies and, correspondingly, to unilaterally designate its official holidays.

The questions that remain, then, are (1) whether the power to establish City holidays is a legislative power reserved exclusively to Council by the Charter and, if so, (2) whether Executive Order 2-21 improperly usurps that power. We conclude in the affirmative on both questions.

First, the power to establish, change, or eliminate official City holidays is essentially a legislative power. Although, as we discuss below, the temporary, symbolic, and/or ceremonial designation of particular days, weeks, or seasons may be accomplished via executive mandate, the wholesale elimination of a City (and statewide) holiday and its replacement with another is best characterized as lawmaking. That characterization is consistent with holiday designation at both the federal and state

16

levels, where it is accomplished by legislative enactment. *See, e.g.*, 5 U.S.C. § 6103 (Congress establishing officially recognized federal holidays); 44 P.S. §§ 11, 17 – 40.13 (General Assembly establishing Pennsylvania state holidays). Being a legislative prerogative, official holiday-making and holiday elimination is reserved by the Charter exclusively to Council.

Second, Executive Order 2-21, because it exercises this power by eliminating Columbus Day and replacing it with Indigenous Peoples' Day without any involvement from or consultation with Council, arrogates to the Mayor a legislative power not granted to that office by the Charter. In doing so, it violates the separation of powers in the Charter. In *Shapp v. Butera*, 348 A.2d 910 (Pa. Cmwlth. 1975), we analyzed an executive order issued by the Governor of the Commonwealth that requested the disclosure of the financial interests of certain Commonwealth officers. We explained that executive orders generally come in three types and that the classification of an executive order will determine its effect and validity:

> The first type includes formal, ceremonial and political orders, which are usually issued as proclamations. The usual purpose of a proclamation is to declare some special day or week in honor of or in commemoration of some special thing or event. It is issued to make the public aware of the commemoration and usually has no legal effect. For example, if, upon the passing of a President of the United States, the Governor, by executive order, would direct that all flags be flown at half-mast for a period of time, his order could not be enforced unless there was some constitutional or statutory provision authorizing such an order. If, however, the Governor ordered the closing of all governmental offices during the day of the funeral of a deceased President, obviously this could effect legal rights, such as the filing of an appeal within the time required by statute.
>
> The second class of executive orders is intended for communication with subordinate officials in the nature of requests or suggested directions for the execution of the duties of the [e]xecutive [b]ranch of government. Like the

17

first classification, this class is not legally enforceable, and the Governor could not seek a court order to enforce his executive order. The executive order would carry only the implication of a penalty for noncompliance, such as a possible removal from office, an official demotion, restrictions on responsibilities, a reprimand, or a loss of favor.

The third classification includes those executive orders which serve to implement or supplement the Constitution or statutes. These executive orders have the force of law. If, for instance, the Governor issued an executive order under Article IV, Section 10 [of the Pennsylvania Constitution[19]] requiring information from officers of the Executive Department upon a subject relating to the duties of their respective offices and any such officers refused, the Governor could obtain a court order and the sanctions of noncompliance with a court order to enforce the executive order. The distinction between this third classification and the second classification is based upon the presence of some constitutional or statutory provision, which authorizes the executive order either specifically or by way of necessary implication.

In no event, however, may any executive order be contrary to any constitutional or statutory provision, nor may it reverse, countermand, interfere with, or be contrary to any final decision or order of any court. The Governor's power is to execute the laws and not to create or interpret them. The [l]egislative [b]ranch of government creates laws, and the[j]Judicial [b]ranch interprets them.

*Id.* at 913-14.

Contrary to Appellees' argument, *see* Appellees' Br. at 15-16, the pertinent portions of Executive Order 2-21 that replace Columbus Day, a Commonwealth-wide holiday, with Indigenous Peoples' Day go well beyond a mere

---

[19] Article IV, section 10 of the Pennsylvania Constitution provides that "[t]he Governor may require information in writing from the officers of the Executive Department, upon any subject relating to the duties of their respective offices." Pa. Const. art. IV, § 10.

ceremonial[20] or internal administrative act.  Although Executive Order 2-21 contains certain terms that direct action by subordinate executive or administrative officials, those portions dealing with Columbus Day are not, like the executive order in *Shapp*, chiefly aimed at internal administration of departments or offices under the Mayor's authority.  They more appropriately are a form of the third type of executive order that is intended to carry the force of law in the City.

By contrast, that portion of Executive Order 2-21 designating Juneteenth as a City holiday merely recites the fact that it already had been designated a holiday across the Commonwealth and directs that it be recognized as a holiday "for all City employees."  (R.R. 000071a.)  It goes on to direct the implementation of the holiday for City employees by way of the applicable Civil Service Regulations and Administrative Board rules.  *Id.*  Although the validity of this portion of Executive Order 2-21 is not before us, its administrative character stands in clear contrast to that portion eliminating Columbus Day (a Commonwealth-wide holiday) and replacing it with Indigenous Peoples' Day.  These reflect two different acts of the Mayor: one administrative and presumably valid, and one legislative and unauthorized by the Charter.

Thus, and in sum, because it is a form of lawmaking, that portion of Executive Order 2-21 eliminating Columbus Day and replacing it with Indigenous Peoples' Day contravenes the Charter's express reservation to Council of all legislative power in the City.  It therefore runs afoul of the separation of powers inherent in the

---

[20] Under Section 4-200 of the Charter, ceremonial acts of the Mayor's office typically are designated to the City Representative, who, "[s]ubject to the direction of the Mayor, . . . shall be the ceremonial representative of the City and especially of the Mayor for ceremonies and public appearances" and "shall manage the preparation and presentation of proclamations and citations on the Mayor's behalf."  Charter, § 4-200.  As far as the record before us reveals, the City Representative was not involved in devising the substance or execution of Executive Order 2-21.

Charter and, accordingly, is invalid. On this ground, we must reverse the trial court's order.

## V. CONCLUSION

Because we reverse the trial court's order sustaining Appellees' preliminary objections to Counts XXI-XXV of the Complaint, the ordinary course on remand would be for those claims to proceed to adjudication. However, our conclusion that Executive Order 2-21 is void as violative of the separation of powers inherent in the Charter (1) involves a question of law and no disputed facts, making further litigation of the Complaint unnecessary, and (2) renders moot the remaining issues on appeal. We therefore reverse and remand to the trial court for further proceedings, including the entry of judgment as appropriate, consistent with our rulings herein.[21]

PATRICIA A. McCULLOUGH, Judge

Judge Dumas did not participate in the decision for this case.

---

[21] Although we do not address the remaining grounds relied upon by the trial court for dismissing the Complaint, we nevertheless note that, as to *res judicata*, the District Court in the Federal Action explicitly dismissed Appellants' state law claims without prejudice so that they could be raised in the trial court. We further note that, in essence, Appellants' equal protection and related claims are based on article I, section 29 of the Pennsylvania Constitution, not article I, section 26. The former has yet to be authoritatively interpreted by Pennsylvania courts, and equal protection claims brought under it are not necessarily analyzed in parallel fashion to claims asserted under the Fourteenth Amendment to the United States Constitution.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Conference of Presidents of Major : 
Italian American Organizations, Inc., : 
Philadelphia City Councilmember Mark F. : 
Squilla, The 1492 Society, Jody Della Barba, : 
and Grand Lodge of Pennsylvania Sons and : 
Daughters of Italy, : 
                        Appellants : 
                               : 
           v. :     No. 516 C.D. 2023
                               : 
City of Philadelphia and : 
Mayor James F. Kenney : 

## *ORDER*

AND NOW, this 6th day of August, 2025, it is ordered that the May 2, 2023 order of the Court of Common Pleas of Philadelphia County (trial court) is hereby **REVERSED**, as set forth in the foregoing Opinion.  This matter is **REMANDED** to the trial court for further proceedings consistent with our rulings therein.

Jurisdiction relinquished.

 

                                        _____
                                      PATRICIA A. McCULLOUGH, Judge